MICHIGAN *ex rel* COMMISSIONER OF STATE POLICE v ONE
HELIX GAME

Docket No. 61031. Submitted June 11, 1982, at Lansing.—Decided
    December 20, 1982.

> The State of Michigan petitioned in circuit court for the forfei-
> ture of several carnival games and associated accessories,
> prizes, and money seized by the State Police at the Branch
> County Fair. The Branch Circuit Court, Thomas C. Megargle,
> J., ordered forfeiture of two of the games involved and ordered
> the rest of the games and other property returned to their
> owners, holding that only games of chance were subject to
> forfeiture. The state appeals, alleging that any game or device
> used for gambling is subject to forfeiture without regard to
> whether it is a game of chance, skill, or both chance and skill.
> *Held:*
>
>   1. The statutory provisions concerning the seizure and forfei-
> ture of gambling devices and associated paraphernalia does not
> require that a game be one solely of chance to be subject to
> forfeiture. It is the risking of money or property on a game, the
> outcome of which is not certain, which subjects the game to
> seizure and forfeiture, without regard to whether skill is in-
> volved in the game. The trial court erred in ordering forfeiture
> only of games solely involving chance.
>
>   2. All but one of the games seized were subject to forfeiture.
> The record is not sufficient for a determination as to the one
> game, and the case is remanded for further factual determina-
> tions regarding that game.
>
>   Reversed and remanded for further proceedings.

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 38 Am Jur 2d, Gambling § 174.
    Constitutionality of statutes providing for destruction of gambling
        devices. 14 ALR3d 366.
    Lawfulness of seizure of property used in violation of law as
        prerequisite to forfeiture action or proceeding. 8 ALR3d 473.
    Paraphernalia or appliances used for recording gambling transac-
        tions or receiving or furnishing gambling information as gaming
        "devices" within criminal statute or ordinance. 1 ALR3d 726.
[3] 38 Am Jur 2d, Gambling § 1.

1. GAMING — SEIZURE OF GAMBLING PARAPHERNALIA — GAMES OF
   SKILL OR CHANCE.

   Any items used to promote gambling or a gambling place must be
   seized and ordered destroyed; it is unnecessary to determine
   whether the games under consideration are games of skill,
   chance, or a combination thereof (MCL 750.308, 750.308a; MSA
   28.540, 28.540[1]).

2. GAMING — SEIZURE OF GAMBLING PARAPHERNALIA.

   Where the eventual end of a game is anything but certain, even
   though the game may involve skill, the risking of money or
   property on its outcome subjects the game and any related
   apparatus to seizure and forfeiture (MCL 750.308, 750.308a;
   MSA 28.540, 28.540[1]).

3. WORDS AND PHRASES — GAMBLING.

   Gambling is involved where a player's money is put at stake on
   the happening of an uncertain event even where the payoff is
   in merchandise rather than money.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Edwin M. Bladen* and *J. Ronald Kaplansky,* Assistants Attorney General, for petitioner.

*Suzanne C. Schuelke,* for respondents.

Before: M. J. KELLY, P.J., and M. F. CAVANAGH and P. R. JOSLYN,* JJ.

M. J. KELLY, P.J. On August 14, 1981, officers of the Michigan State Police, acting pursuant to a search warrant, seized several carnival games, accessories, prizes, and money at the Branch County Fair in Coldwater. Thereafter, a petition was filed in circuit court for forfeiture of the items seized. At the forfeiture hearing, defense counsel conceded the search warrant was properly executed and that one of the games, "Rat Roulette", was a gambling device subject to forfeiture. Following the hearing, the circuit court found that

* Circuit judge, sitting on the Court of Appeals by assignment.

the "Rat Roulette" game and one of two duck pond games were gambling devices and were therefore subject to forfeiture. All other seized property was ordered returned to its owners. From this judgment, petitioner appeals as of right.

I

Several games are involved in this action. One is a helix (spiral) game. The game consists of a seven- to eight-foot steel frame, which houses a spiral cage. The cage contains balls the size of pool balls. Some balls are printed with numbers and others bear dots. When in operation, the balls rotate in the game's spiral cage. A number of cords are attached to the cage. The player pays one dollar and pulls one of the cords. As a cord is pulled, a gate opens and one of the balls drops out. If the ball is imprinted with a dot, the player wins a prize. If the ball bears a number, reference must be made to a conversion chart. Some ball numbers are on the chart, others are not. If the number appears on the chart, the ball number is converted to a different point number. A certain number of points is required from the conversion chart in order to win a prize. In addition, certain ball numbers require the player to increase his payment for each pull of the cord but also increase the value of his possible prize.

Special Agent Garry Goddard, of the Attorney General's Economic Crime Division, played the game at the fair on August 13, 1981. Goddard testified he could not see the numbers or spots on the balls as they quickly spun in the cage. When a ball dropped, the operator would call off the ball number while making sure the player kept his eyes on the conversion chart. Goddard saw no

winners while playing the game. At the invitation of the game's operator, Goddard was allowed to place side bets while another player played the game.

Terry Hampton, a self-acclaimed skilled helix player, testified that skill was involved in playing the helix game, as one could indeed see the numbers and dots on the balls as they rotated by the cage openings. With proper timing, the player could cause a desired ball to drop from the cage. According to Hampton, he can get the red dot balls "almost every time". Based on this testimony, the trial court found the helix game to be "a game of skill".

Another one of the games is known as ring-a-pin or the pin game. While mechanically different, ring-a-pin is similar in operation to the helix game. There are five rows of clothes pins, 20 to 30 pins per row, with the rows placed in an ascending step fashion. On the back of each pin is a number. Mirrors behind the pins allow the player to see some of the pin numbers. The player pays one dollar to attempt to throw a rubber mason jar type ring around one of the pins. If the ring lands squarely around a pin, the operator indicates the number on the pin, which is then compared to a conversion chart. The chart assigns a certain number of stars to some of the pin numbers. After the police seizure, it was discovered that some pins had three-digit numbers while the conversion chart covered only two-digit numbers. If a player obtained 100 stars, he won his choice of a stuffed animal or $20. One pin number, however, required the player to pay an extra dollar for each throw of the ring. In return, the value of the stuffed animal or cash prize was increased by $20. Agent Goddard

testified that he quit the game after spending $30 and attaining only 98 stars, that most of the numbers on the pins were out of sight, and that, when he insisted, the operator showed him a pin, but kept a thumb over one of the numbers. The trial court found that manipulation by the operator of the game took away any element of skill, but found the ring-a-pin game to be "a game of skill", since skill was necessary to throw the rubber ring over a particular pin.

Also seized by the State Police were a number of claw machines. These are crane-type devices with claws attached to the end of a chain. At the bottom of the machine are prizes and tokens for better prizes. After a dime is deposited, the crane rotates and stops at a random position. The claw then falls and the player can operate levers to try to close the claw around a prize or token. The trial court found that whether any prize was grabbed with the claws depended on the skill of the operator.

The final carnival games seized were two duck ponds. A duck pond consists of toy ducks circulating in a water trough. For $.50 per play or one dollar for three plays, the player selects a duck. Each duck has a number or letter imprinted on its bottom. Each number or letter corresponds to a prize and the player, therefore, receives some prize for each duck selected. One of the two ponds had a mirror on the bottom of its trough which allowed the ducks' numbers to be reflected. Agent Goddard testified, however, that the water was too murky for the numbers to be clearly viewed. The trial court ruled this duck pond to be a "game of skill". The other duck pond did not have a mirror and, therefore, the ducks' numbers were not visible.

The trial court ruled that this duck pond did not involve skill.

The trial court held that only games of chance, or what it termed per se gambling devices, were subject to forfeiture. Thus, the trial court ordered that only the rat roulette game, conceded by defense counsel to be a gambling device, and the duck pond without a mirror were subject to forfeiture. The state was ordered to return the other games and accompanying prizes, accessories, equipment, and money to their owners. On appeal, respondents do not contest the validity of the court's ordering the rat roulette and the unmirrored duck pond games forfeited.

## II

The statutory scheme governing gambling is set forth at MCL 750.301-750.315; MSA 28.533-28.547. In addition, lotteries are governed by the provisions of MCL 750.372-750.376; MSA 28.604-28.608. MCL 750.301-750.306; MSA 28.533-28.538 provide penal sanctions for gambling and the keeping of gambling apparatus. MCL 750.308; MSA 28.540 [§ 308] provides for the issuance of search warrants and MCL 750.308a; MSA 28.540(1) [§ 308a] allows for the destruction or other disposition of property seized pursuant to § 308.

In the instant case, criminal proceedings were not initiated against those owning or operating the carnival games. Rather, the state acted only pursuant to §§ 308 and 308a in obtaining a search warrant, seizing the games and related apparatus, and applying for an order of forfeiture of the seized items. Our resolution of this appeal, therefore, requires a determination of what types of

property may be seized and destroyed under §§ 308 and 308a.

Section 308 is not a model of legislative clarity. Indeed, although the entire section is only two sentences long, the first sentence contains 382 words. In order to apply the statute to the case at bar, we focus on the following pertinent language:

"If a person makes oath before [a] * * * magistrate that he has probable cause to believe and does believe that a * * * place is used * * * for the * * * registering of bets upon any race, game, contest, act or event, and that persons resort thereto for any such purpose, such magistrate * * * shall, if he be satisfied there is reasonable cause for such belief, issue a warrant commanding * * * any * * * police officer to enter and search such * * * place, and if any * * * memoranda of any bet, or other implements, apparatus or material of any form of gaming be found in said place, to take into his custody all the implements, apparatus or material of gaming as aforesaid, including any articles, equipment, furniture, loud speakers and amplifying apparatus, adding machines, calculators, money changers and boxes and money found therein or in or on gambling apparatus, or material used in connection with or the promotion of gambling or a gambling place * * *. The provisions of law relative to destroying or other disposition of gaming articles shall apply to all articles and property seized as herein provided for."

Under this language, once probable cause is established that any place is being used for the registering of bets upon any race, game, or contest, a search warrant may be issued and, if any memorandum of any bet or any form of gaming is found in the place searched, the police officers may confiscate the gambling apparatus and any materials used to promote the gambling or the gambling place. Section 308a then allows for a court to order

the destruction or other disposition of any articles or property lawfully seized under such a warrant.

The broad provisions in these sections allow for much more than the destruction of only games of pure chance. Any items used to promote gambling or a gambling place may be seized and ordered destroyed. It is unnecessary to determine whether the games under consideration are games of skill, chance, or a combination thereof. Once a place is used for the "registering of bets upon any race, game, contest, act or event" the statutory seizure and forfeiture provisions may be invoked. The words race, game, and contest do not refer only to games purely of chance. Rather, these words cover games of skill as well. Indeed, "contest" is defined as a "struggle for victory or superiority". *The Random House Dictionary of the English Language* (New York: Random House, 1971). A struggle for superiority necessarily involves games of skill. Similarly, we fail to see how the term "race" could reasonably be limited to events involving only pure chance.

Section 308 authorizes the seizure of gambling apparatus whenever a place is used for the registering of bets upon a contest. "Betting in common speech means the putting of a certain sum of money or other valuable thing at stake on the happening or not happening of some uncertain event." *Shaw v Clark,* 49 Mich 384, 388; 13 NW 786 (1882). Even though a game may involve skill, when the eventual end is anything but certain the risking of money or property on its outcome subjects the game and related apparatus to seizure and forfeiture.

This construction of §§ 308 and 308a is consistent with the entire legislative scheme on gambling. For example, § 303 makes it a misdemeanor

for any person to keep or maintain any "game of skill or chance, or game partly of skill and partly of chance, used for gaming". Under this section, it is "not necessary to determine whether the games under consideration are games of skill or games of chance, or games partly of skill and partly of chance as the statute makes no distinction in either kind of game". *Henry v Kuney,* 280 Mich 188, 192; 273 NW 442 (1937). Gambling occurs when there is the chance for profit if the player is skillful and lucky. See *Henry, supra,* p 193.

Only one portion of the legislative gambling scheme deals with per se gambling devices, *i.e.,* machines that can be used for nothing else except gambling. Section 302 provides, among other things, that any person "who shall suffer or permit on any premises owned, occupied or controlled by him any apparatus used for gaming or gambling" shall be guilty of a misdemeanor. This part of § 302 deals not with gambling itself but with the mere keeping of a gambling device, regardless of whether it was ever used for gambling. The proper construction of this limited prohibition, therefore, is that only games that are for gambling use only, and therefore are gambling devices per se, are prohibited from being possessed. *People v Lippert,* 304 Mich 685, 690-691; 8 NW2d 880 (1943).

We find, therefore, that the lower court erred in determining that only games involving solely chance were subject to forfeiture under §§ 308 and 308a. Once it was established that bets were made on any game of skill or chance, the game and any related apparatus were subject to forfeiture.[1]

---

[1] We note that the Legislature did carve out an exception to the gambling laws when it enacted the Michigan Exposition and Fairgrounds Act, MCL 285.161 *et seq.;* MSA 12.1280(51) *et seq.* The act allows concessionaires who are licensed by the Department of Natural Resources to conduct games of skill as defined by MCL 285.172; MSA

### III

We now apply the law to the facts of the case at bar. Bets were registered on both the helix game and the ring-a-pin game. Unrebutted testimony established that the players had to continually risk one dollar after another on the anything-but-certain chance that they would win $20 or more in return. In addition, others were allowed to place side bets on whether the players would be successful. Whether the games involved any degree of skill is irrelevant. Sections 308 and 308a allow for the seizure and forfeiture of the helix game, the ring-a-pin game, and all related score sheets, prizes, equipment, money, and furniture.

The claw machines involved the risking of only an initial $.10 stake on the chance that luck and skill could return the player a prize. Since the player's money was put at stake on the happening of an uncertain event, the game involved betting. Even when the pay off is in merchandise rather than money, gambling is involved. See *Eastwood Park Amusement Co v Mayor of East Detroit,* 325 Mich 60, 67; 38 NW2d 77 (1949). Thus, the claw machines and all related prizes, equipment, money, and furniture are subject to seizure and forfeiture.

The final game we must consider is the duck pond which had a mirror on the bottom of its

12.1280(62) and provides that such games will be exempted from the gambling laws. MCL 285.173; MSA 12.1280(63). However, this act applies only to state fairs. The appropriate remedy for such a problem must come from the Legislature. We direct the parties' attention to this act only to point out that the fact that the Legislature passed a specific section relating to concessionaire games of skill at state fairs and exempted such games, when licensed, from the gambling laws lends further support to our conclusion that such games, when not licensed, are considered gambling.

trough which reflected the numbers on the bottom of the ducks. In this game, every duck selection resulted in a prize. Testimony differed at trial as to whether the water was too murky for the ducks' numbers to be seen. The trial court did not make a finding on this question, but stated only that "[t]he mere fact that the water may be murky in the duck pond game containing the mirror is not the fault of the device itself". If the numbers on the ducks were clearly visible to the players and they could select the number they desired, the game would not involve betting. The resulting prize would be a certain event and, therefore, the paying of the cost to play could not be considered betting. If, however, the duck numbers could not be seen and the prizes varied in value, the duck pond would involve betting. The value of the prize returned for the players' stake would be an uncertain event. Thus, whether the mirrored duck pond and its accessories are subject to forfeiture requires a factual determination on the visibility of the ducks' numbers.

We reverse the circuit court's order denying the state's forfeiture petition and remand for further proceedings. In addition to making a factual determination as to whether the value of the prize received in the mirrored duck pond game was certain, the trial court shall provide for the destruction or other disposition of the other seized items.

Reversed and remanded.