ATTORNEY GENERAL v
POWERPICK PLAYER'S CLUB OF MICHIGAN, LLC

Docket No. 283858. Submitted June 9, 2009, at Grand Rapids. Decided
January 5, 2010, at 9:05 a.m.

The Attorney General brought an action in the Kent Circuit Court,
George S. Buth, J., against PowerPick Player's Club of Michigan,
LLC, seeking to enjoin an alleged public nuisance resulting from
defendant's operation of what it characterizes as a professional
lottery club. The Attorney General alleged that defendant's opera-
tions violated several antigambling statutes and therefore consti-
tuted an enjoinable public nuisance and that the operations violated
the Michigan Consumer Protection Act (MCPA), MCL 445.901 *et seq.*
The Attorney General moved for summary disposition, alleging that
there was no dispute with regard to the facts and that the only matter
to be decided was what legal conclusions could be drawn from the
facts. PowerPick also moved for summary disposition, asserting
several affirmative defenses. The court denied the Attorney General's
motion, concluding that there were a number of factual issues yet to
be decided. The Attorney General appealed by leave granted.

The Court of Appeals *held*:

1. At the time of the circuit court's ruling there remained no
genuine issue of material fact that would have precluded the grant of
summary disposition with respect to the Attorney General's nuisance
claim. The evidence did not present disputed issues of fact. The only
question presented for resolution was whether PowerPick's opera-
tions, as described in the uncontroverted materials and documents
presented to the circuit court, fell within the scope of the statutes
cited by the Attorney General. This was purely a legal question for
the court, not a factual question for the jury.

2. The Attorney General was entitled to judgment as a matter
of law with respect to the nuisance claim because PowerPick's
operations constituted an enjoinable nuisance. The order denying
the Attorney General's motion for summary disposition with
respect to the nuisance claim must be reversed.

3. PowerPick's PowerPool scheme contemplates the placement
of bets under MCL 750.301. PowerPick registers those bets in

violation of MCL 750.304, and PowerPick possesses memoranda of bets in violation of MCL 750.306.

4. PowerPick's random assignment of customers to the individual PowerPools injects an additional element of uncertainty into a customer's chance of sharing in a winning ticket and the customers bet on the outcome of these random computerized assignments. This scheme is encompassed within the definition of betting.

5. The general prohibition against the sale of lottery tickets by unlicensed persons contained in MCL 432.27(1) encompasses for-profit, third-party transfers. PowerPick sells lottery tickets or shares at a price greater than that fixed by rule of the Michigan Lottery commissioner in violation of MCL 432.27(1).

6. PowerPick's periodic random drawings for Michigan Lottery scratch-off tickets constitute an illegal lottery within the meaning of MCL 750.372, and the MegaPools constitute an illegal gift enterprise within the meaning of MCL 750.372.

7. Although an unscratched instant lottery ticket generally has little or no actual monetary worth, it can have a great deal of potential value and thus may constitute a "prize" for purposes of considering the traditional elements of a lottery consisting of consideration, prize, and chance.

8. PowerPick violates the provisions of MCL 750.372 by setting up and managing the periodic drawings for scratch-off tickets and the MegaPools.

9. PowerPick's various gaming schemes violate the terms of MCL 432.27(1), MCL 750.301, MCL 750.304, MCL 750.306, and MCL 750.372. The lottery and gambling statutes were validly enacted to preserve the public safety, morals, and welfare. Harm to the public is presumed to flow from PowerPick's operations that violate these statutes. PowerPick's business operations, taken as a whole, constitute a public nuisance.

10. PowerPick's office in Comstock Park and the furniture, fixtures, and contents of the office constitute a nuisance as a matter of law.

11. PowerPick engages in gambling within the meaning of MCL 600.3801.

12. PowerPick's periodic drawings for scratch-off tickets constitute gambling under MCL 600.3801.

13. PowerPick owns, leases, conducts, or maintains the building in Comstock Park and uses it for the purpose of gambling within the meaning of MCL 600.3801, even if it does not hold the actual periodic drawings for the scratch-off tickets at the building.

The office in Comstock Park as well as the furniture, fixtures, and contents of the office constitute an enjoinable nuisance under MCL 600.3801.

14. The trial court erred by denying the Attorney General's motion for summary disposition with regard to PowerPick's affirmative defenses under MCR 2.116(C)(9).

15. The Attorney General did state a claim on which relief could be granted and properly pleaded and supported his allegations of nuisance and unlawful gambling.

16. PowerPick failed to support its claim that it was being treated differently than similarly situated entities. No equal protection violation was shown.

17. The equitable defense of laches was unavailable to Power-Pick because it acted with unclean hands by violating MCL 432.27(1), MCL 750.301, MCL 750.304, MCL 750.306, and MCL 750.372. For the same reason, PowerPick was not entitled to assert the equitable defense of unclean hands.

18. PowerPick's affirmative defenses fail as a matter of law. The trial court should have granted the Attorney General's motion for summary disposition with regard to those affirmative defenses.

19. The trial court, on remand, must address the claim that PowerPick's operations violate the MCPA.

20. The order of the trial court must be reversed and the matter must be remanded to the trial court for the entry of a judgment in favor of the Attorney General with respect to the nuisance claim and for consideration of the MCPA claim.

Reversed and remanded.

HOEKSTRA, J., concurring in part and dissenting in part, agreed with the majority that PowerPick violates MCL 432.27(1), by reselling lottery tickets at a price greater than that fixed by the Michigan Lottery commissioner, that it violates MCL 750.372, because its random drawings for scratch-off tickets constitute an illegal lottery, that its MegaPools constitute an illegal gift enterprise, that Power-Pick's affirmative defenses fail as a matter of law, and that it is appropriate to remand the case for consideration of the MCPA claims. Judge HOEKSTRA would, however, affirm the trial court's holding that factual issues remain with respect to whether the amount charged in addition to the cost of the purchased lottery tickets is a reasonable amount to pay for PowerPick's business expenses and profit or is in fact a second bet that buys the customer a chance to be assigned to a winning pool. Because these factual issues exist, it is premature to determine whether PowerPick's business operations and its office and furnishings constitute a nuisance. The case should be remanded

to also consider whether a violation of MCL 432.27(1) constitutes a public nuisance and, if so, whether, and to what extent, the violation is subject to the sanctions of MCL 600.3801. Although the majority correctly holds that the drawings for scratch-off tickets are gambling and that PowerPick can be sanctioned under MCL 600.3801, the case should be remanded for a determination regarding what assets, if any, are subject to the sanction.

1. MOTIONS AND ORDERS — SUMMARY DISPOSITION.

Summary disposition of all or part of a claim or defense may be granted when, except as to the amount of damages, there is no genuine issue as to any material fact; a genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ; in general, a factual dispute exists when there is conflicting evidence concerning what happened, or when, where, or how something happened, or who was involved, or some other similar factual inquiry (MCR 2.116 [C][10]).

2. TRIAL — JULY TRIALS — ROLE OF JURY.

The proper role of a jury is to decide what the facts are and not what the facts mean.

3. WORDS AND PHRASES — BETTING.

The term "betting" in common speech means the putting of a certain sum of money or other valuable thing at stake on the happening or not happening of some uncertain event.

4. GAMING — BETTING.

The legislative goal behind the enactment of MCL 750.301 was the suppression of betting; the statute prohibits private betting between consenting parties and is not limited to combating only the effects of organized and commercialized gambling.

5. LOTTERIES — LICENSES — FOR-PROFIT, THIRD-PARTY TRANSFERS.

The Legislature, in enacting MCL 432.27(1), intended that the prohibition against sales of lottery tickets by persons who are not licensed agents is to be read broadly; the general prohibition against unlicensed sales or selling a ticket at a price greater than that fixed by the lottery commissioner encompasses for-profit, third-party transfers.

6. LOTTERIES — TRADITIONAL ELEMENTS.

The traditional common-law elements of a lottery are consideration, prize, and chance; these essentials cannot be used to frustrate the

plain and ordinary meaning of the word lottery; a "lottery" is commonly defined as a gambling game or method of raising money in which a large number of tickets are sold and a drawing is held for prizes, or a drawing of lots, or any happening or process that is or appears to be determined by chance.

7. LOTTERIES — GIFT ENTERPRISES.

A gift enterprise is, among other things, a merchant's scheme to induce sales by giving buyers tickets that carry a chance to win a prize (MCL 750.372).

8. LOTTERIES — GAMBLING — PUBLIC HARM.

Michigan's lottery and gambling statutes were validly enacted to preserve the public safety, morals, and welfare; harm to the public is presumed to flow from violation of a valid statute enacted to preserve the public health, safety, and welfare.

9. GAMBLING — COMMON-LAW ELEMENTS.

The common-law elements of "gaming" or "gambling" are price or consideration, chance, and prize or award.

*Michael A. Cox*, Attorney General, *B. Eric Restuccia*, Solicitor General, and *Donald S. McGehee* and *Melinda A. Leonard*, Assistant Attorneys General, for plaintiff.

*Morganroth & Morganroth, PLLC* (by *Mayer Morganroth* and *Jason R. Hirsch*), for defendant.

Before: JANSEN, P.J., and HOEKSTRA and MARKEY, JJ.

JANSEN, P.J. In this action brought to enjoin an alleged public nuisance, plaintiff Attorney General appeals by leave granted the circuit court's order denying his motion for summary disposition. We reverse and remand for further proceedings consistent with this opinion.

I

Defendant PowerPick Player's Club of Michigan, LLC, operates what it characterizes as a professional

lottery club. The Attorney General filed the present action alleging that PowerPick's operations violated several of Michigan's antigambling statutes and therefore constituted an enjoinable public nuisance. The Attorney General also alleged that PowerPick's operations violated the Michigan Consumer Protection Act (MCPA), MCL 445.901 *et seq.*

A

Contrary to the ruling of the circuit court, the material facts of this case are beyond serious dispute. Indeed, PowerPick, itself, confirms the majority of the relevant factual details of this case through its own exhibits and documentary evidence. PowerPick is a subsidiary of PowerPick America, LLC, which was started in Arizona in the mid-1990s by Andrew and Judy Amada. It has operated in Michigan since 2002. PowerPick's main business is pooling lottery players. On its website, under the heading "What is PowerPick all about," PowerPick describes the nature of its business in broad overview:

> PowerPick is about giving people HUNDREDS MORE chances of becoming a lottery jackpot winner through pools put together by PowerPick, and all you need is yourself. Our pools include many benefits . . . . We do everything for you, so you can start out sharing HUNDREDS of tickets instead of sharing just a few tickets! While the best example of pooling is the "office pool" where groups of players combine their dollars to share the tickets and share the winnings, with PowerPick, each person in the group ends up with dramatically more chances of becoming a big winner because of the large blocks of tickets that are purchased. Plus you will benefit from so many of our other free services . . . .
>
> PowerPick does all the work [for] you. One call can answer your questions and we can place your order by

phone or mail. You can use a credit card, debit card or check over the phone. You won't be standing in line, forgetting to buy tickets or making last minute dashes to the store. It's simply the most powerful, exciting and convenient way of playing.

Customers join PowerPick by paying a nominal "one-time setup fee." Once a customer has joined, he or she may then select from PowerPick's various pooling packages. PowerPick uses a computer system to randomly assign each customer to a particular pool of the type that he or she has chosen. After the assignment is made, PowerPick mails the customer a confirmation certificate, listing all the numbers purchased for the particular pool. PowerPick operates several different types of pooling packages that its customers can choose to join.

PowerPick's primary pooling packages are called "PowerPools," which consist of Mega Millions pools, Classic Lotto 47 pools, Keno pools, and Fantasy 5 pools. According to PowerPick's website, the Mega Millions pools and Classic Lotto 47 pools consist of either 25 or 50 shares each. The Keno pools and Fantasy 5 pools consist of 10 shares each. After the participants in a particular PowerPool pay their money, PowerPick uses a portion of it to buy lottery tickets from a licensed Michigan lottery retailer.

The participants in the particular PowerPool then share any winnings on a pro rata basis. Thus, for example, if a customer buys one share in a 25-share PowerPool, he or she receives $1/25$ of any winnings for that particular pool. Similarly, if a customer buys three shares in a 50-share PowerPool, he or she receives $3/50$ of any winnings for that particular pool.

PowerPick operates other pools as well. For example, customers who have bought into one of PowerPick's main PowerPools may also participate in one or both of

the "Million Dollar Clubs" (MDCs). PowerPick offers a
$50 MDC and $100 MDC. PowerPick's website de-
scribes the $100 MDCs as follows:

> We will purchase up to 5 blocks of 1,000 tickets ... on
> EVERY drawing night the Mega Millions jackpot is esti-
> mated to be $100 MILLION or more. In addition you can
> purchase up to 3 shares in each block [pool], which makes
> your share of the prize 3 times greater!
>
> We will try to keep the number of shares in each pool to
> about 1,200 plus or minus about 100 to produce an approxi-
> mate range of 1100 to 1300 shares, with 1100 being the
> absolute minimum. PowerPick receives any shares under
> 1100 that are not ordered. So, if there are 1,200 shares in
> the pool, then each prize will be divided 1,200 ways. And, of
> course, all the prizes, not just the jackpot, will be distrib-
> uted.

PowerPick further describes how to participate in the
$100 MDCs:

> All you do is sign up saying that you would like to share
> in 1,000 extra Mega Millions tickets each drawing night
> that the Mega Millions jackpot is $100 Million or higher.
> What does this cost? Just a Buck! You will own 1 share in
> 1,000 tickets for only $1 per drawing.

The $50 MDCs operate similarly except that Power-
Pick purchases 500 tickets, rather than 1,000 tickets,
when the Mega Millions jackpot is more than $50
million but less than $100 million. PowerPick's website
further describes the $50 MDCs:

> This club works identically the same as the $100 MDC,
> except that each pool is 500 tickets instead of 1,000 tickets
> and the number of shares in each pool is about half as
> many, so the number of shares in each pool will be
> approximately 600-700, with 600 being the absolute mini-
> mum. PowerPick receives any shares under 600 that are
> not ordered.

Unlike the participants in the PowerPools, the participants in the MDCs do not know how many other participants will be in their respective pool at the time they buy their tickets. According to Andrew Amada's deposition testimony, PowerPick decides how many players will be in an MDC pool only after considering how many shares have been bought. If more than 1,300 shares are bought, a second MDC pool is opened. The number of participants is then split evenly between the two MDC pools.

PowerPick also conducts what it calls "MegaPools." It describes the MegaPools on its website as follows:

> Each MegaPool is a separate pool of 100 Mega Millions tickets that are purchased every Tuesday and Friday night. This pool is a FREE bonus and is in addition to each player's PowerPool.
>
> *   *   *
>
> Each MegaPool is made up of approximately 700-1,400 players. Every active member with a PowerPool selection is included in a MegaPool!

Thus, every PowerPick customer is included in one of the MegaPools as an additional "FREE bonus" as long as he or she is participating in at least one PowerPool.

It also appears that PowerPick can purchase shares in any of its pooling packages just like any of its customers can. In this way, PowerPick, itself, receives a pro rata share of any money won by the particular pools in which it participates.

PowerPick conducts additional games of chance that it announces from time to time in its newsletter. For instance, in one game, newsletter readers were asked to count the "Shamrocks hidden" within the newsletter and send in their count. The newsletter announced that

"[t]he first three randomly drawn with the correct answer will each win 10 of the $10 Take Home Millions scratch tickets." PowerPick regularly awards Michigan Lottery scratch-off tickets as prizes in these periodic newsletter games.

PowerPick claims to be substantially similar to a typical office lottery club. But unlike the practice of a typical office lottery club, PowerPick does not use all the money it collects from its customers to buy lottery tickets. According to its website, only 51 percent of the money that PowerPick collects from its customers is used to buy lottery tickets. Forty-one percent goes to "[c]ompany operating costs" and eight percent is taken as PowerPick's profit. Further, as noted previously, PowerPick can supplement its profits by purchasing its own shares in the various pools that it operates. PowerPick, itself, receives a pro rata share of any winnings when it does so.

B

In March 2006, the Attorney General sent a letter to PowerPick, demanding that PowerPick

> cease and desist using the "Michigan Lottery" and "Mega-Millions" names and any versions of those names, cease and desist selling or reselling Michigan Lottery tickets or shares and providing Michigan Lottery tickets or shares as bonuses or awards to its customers, and that PowerPick disconnect, disable and discontinue its Michigan Web site for the reason that engaging in these activities violates [federal law] and the Michigan Penal Code.

The Attorney General pointed out that MCL 432.27(1) provides that "[a] person shall not sell a ticket or share at a price greater than that fixed by rule of the commissioner. A person other than a licensed lottery sales agent shall not sell lottery tickets or shares." The

Attorney General also noted that "MCL 750.301 prohibits accepting money with the understanding that money will be paid to any person contingent upon the happening of an uncertain event." The Attorney General went on to state:

> The Penal Code further prohibits buying and selling pools, MCL 750.304; publishing information concerning making bets or selling pools, MCL 750.305; keeping or occupying a building for gaming, MCL 750.302; possessing pool tickets, MCL 750.[3]06(1); promoting a lottery for money, MCL 750.372(1); and setting up or aiding in the setting up, managing, or drawing of a lottery or gift enterprise, *id.* The Penal Code also declares pool tickets a common nuisance, MCL 750.306(1).

PowerPick continued its operations, leading the Attorney General to issue a notice of intended action in September 2006. The notice contained the allegations set out in the cease and desist letter. The Attorney General then filed a complaint containing the same allegations. PowerPick answered the complaint and asserted several affirmative defenses, including failure to state a claim on which relief could be granted, equal protection guarantees, laches, and unclean hands.

The parties filed cross-motions for summary disposition. At a hearing in January 2008, the Attorney General asserted that there was no dispute as to the facts and that the only matter to be decided was what legal conclusions could be drawn from the facts. The Attorney General asked the circuit court to construe the applicable statutes and to consider the undisputed evidence from PowerPick's website and handbook, as well as the relevant deposition testimony. The Attorney General argued that PowerPick illegally collected wagers into pools and then sold interests in the pools. The Attorney General further argued that PowerPick's random drawings for scratch-off tickets constituted an illegal lottery and that PowerPick

illegally promoted both its own lottery and the Michigan Lottery for money in contravention of MCL 750.372. The Attorney General also argued that PowerPick was illegally selling shares in lottery tickets and possessed pool tickets in violation of MCL 750.306.

PowerPick argued that it was entitled to summary disposition, but also asserted that even if the court was not inclined to grant summary disposition in its favor, the court should at least deny the Attorney General's motion because there was "a clash of evidence." However, despite this assertion, PowerPick never specifically identified which evidence was in dispute. PowerPick's attorney argued that PowerPick had not promoted a lottery for money, but had simply promoted its own business. PowerPick pointed to a federal case in which its Arizona operation had been accused of violating federal lottery laws, but in which the federal court had ruled against the government on the ground that PowerPick was simply being compensated for services it provided to its customers. PowerPick asserted that it provided valuable services, such as eliminating the need for its customers to wait in line to buy lottery tickets, holding the lottery tickets in trust for its customers, and making sure that none of the lottery tickets was lost.[1] PowerPick further argued that it was not reselling lottery tickets, but was merely acting as the representative or agent of its customers in buying the tickets.

The Attorney General argued that the federal case cited by PowerPick was not comparable to the present situation because Michigan lottery law is different from federal lottery law.

---

[1] PowerPick has also described other services that it allegedly provides for its customers, including organizing the pools, sending out confirmation certificates, checking tickets for winnings, mailing out winnings statements, and overseeing the collection and distribution of all winnings.

PowerPick then argued that the Attorney General's complaint should be dismissed on the basis of the doctrine of laches. This argument was premised on extensive correspondence among PowerPick, its attorney, the lottery commissioner, the Bureau of State Lottery, and the Attorney General's office. That correspondence had begun in November 2001, when PowerPick was first contemplating starting its Michigan operations. At that time, a consultant for PowerPick had sent Michigan's acting lottery commissioner a package of materials regarding PowerPick's proposed business operations. In the ensuing correspondence, PowerPick explained why it should be allowed to operate in Michigan, and the acting lottery commissioner, Bureau of State Lottery, and the Attorney General's office wrote back to PowerPick, asking for various information, expressing concerns, and giving explanations. PowerPick pointed to certain statements within some of the letters that, it argued, showed that the officials had led it to believe that its operation would not be illegal in Michigan. For instance, PowerPick pointed out that in one letter, the acting lottery commissioner had seemed to compare PowerPick's proposed operations to those of a legal lottery club. PowerPick also pointed to a letter in which one of the Michigan officials stated that PowerPick's "innovative lottery ticket pooling and agency relationship is very interesting." Finally, PowerPick pointed to a news report that discussed PowerPick's proposed operations and announced that "state lawyers haven't found anything wrong with PowerPick." The Attorney General argued that PowerPick could not prevail on its laches defense because it had shown no prejudice.

Lastly, PowerPick argued that the Attorney General had acted with unclean hands and that the Attorney General's actions violated the guarantee of equal pro-

tection because other similarly situated lottery clubs were operating in Michigan and had not been targeted by the Attorney General. The Attorney General's representative responded that these other lottery clubs were operating legally.

Following the parties' arguments, the circuit court ruled from the bench:

> All right. . . . [T]he Court does agree with [the Attorney General] that the [federal] Arizona case does not necessarily control this case and was brought by the postal service, it's Arizona law, and also that it's the legal meaning of the facts.
>
> However, the Court's of the opinion that there are a number of factual issues here which will have to be decided at trial and that defendant here has properly pled its affirmative defenses.

II

The Attorney General argues that the circuit court erred by denying his motion for summary disposition brought pursuant to MCR 2.116(C)(10). We agree with the Attorney General's argument insofar as it relates to his nuisance claim.

A

We review de novo the circuit court's decision on a motion for summary disposition. *Dressel v Ameribank,* 468 Mich 557, 561; 664 NW2d 151 (2003). Summary disposition of all or part of a claim or defense may be granted when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves

open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

B

We conclude that, at the time of the circuit court's ruling in this case, there remained no genuine issue of material fact that would have precluded the grant of summary disposition under MCR 2.116(C)(10) with respect to the Attorney General's nuisance claim. PowerPick and the circuit court were simply incorrect in their belief that the evidence presented disputed issues of fact. Indeed, the circuit court's ruling was internally inconsistent on this very issue. On the one hand, the circuit court agreed with PowerPick that what was at issue was "the legal meaning of the facts." But on the other hand, the court stated that "there are a number of factual issues." Of critical importance, the circuit court never identified exactly what these "factual issues" were. Nor did PowerPick identify any actual factual disputes.

PowerPick continues to maintain that "[d]etermining the meaning of the facts at issue is a quintessential jury question." But PowerPick is clearly confused about what constitutes a factual dispute and about the proper role of a jury. In general, a factual dispute exists when there is conflicting evidence concerning *what* happened, *when* something happened, *where* something happened, *how* something happened, *who* was involved, or some other similar factual inquiry. In this case, a jury question would have been presented, for instance, if there had been conflicting evidence concerning how defendant's business actually operated. But no such conflicting evidence was presented.

The proper role of a jury is to decide what the facts are—*not* what the facts mean. As aptly noted by the United States Court of Appeals for the Fourth Circuit in *Atlantic Purchasers, Inc v Aircraft Sales, Inc*, 705 F2d 712, 719 (CA 4, 1983):

> A jury . . . does not directly determine whether a litigant has contravened the statutes. Rather, the jury's function is to find the facts, and based on the jury's findings the court must then determine as a matter of law whether the defendant's conduct violated [the statutes]. [Quotation marks and citations omitted.]

The Attorney General correctly argues that what is at issue here is the *legal meaning of the undisputed facts*. The critical facts in this case consist of PowerPick's own description of its business operations in its player handbook, on its website, in its newsletters, in the deposition testimony of its owners and employees, and in the various other documents presented to the circuit court. The operations described in these materials and documents are somewhat complicated, but there is no dispute concerning what these materials and documents actually say or mean. The only question presented for resolution was whether PowerPick's operations—as described in the uncontroverted materials and documents presented to the circuit court—fell within the scope of the statutes cited by the Attorney General. This was a purely legal question, not a factual one. See *People v Rutledge*, 250 Mich App 1, 4; 645 NW2d 333 (2002) (observing that "[w]hether conduct falls within the statutory scope of a criminal statute is a question of law that is reviewed de novo on appeal").

C

We also conclude that because PowerPick's operations constituted an enjoinable nuisance, the Attorney General was entitled to judgment as a matter of law with respect his nuisance claim.

1

We first conclude that PowerPick's PowerPool scheme contemplates the placement of bets under MCL 750.301, that PowerPick "registers" these bets in violation of MCL 750.304, and that PowerPick possesses "memoranda of ... bet[s]" in violation of MCL 750.306. In a typical office lottery club, *all* the money contributed by the participants is used to purchase commonly held lottery tickets. In other words, each member of a typical office lottery club is simply playing the Michigan Lottery—a legal lottery authorized by Michigan law, see Const 1963, art 4, § 41; MCL 432.1 *et seq.*—albeit in concert with the other members of the club. As such, each participant in a typical office lottery club places only one bet—a legal bet that the underlying lottery ticket or tickets will win. In contrast, each PowerPick customer who participates in a PowerPool actually places two bets each time he or she purchases lottery tickets through the PowerPick scheme. As will be explained more fully hereinafter, the customer places a legal bet on the underlying lottery tickets that PowerPick purchases for that customer's particular pool. But the customer also places a second bet, wagering that Power-Pick will randomly assign him or her to a winning pool. It is this second bet that renders PowerPick's PowerPool scheme an illegal betting operation.

PowerPick admits that it uses only 51 percent of the money it collects from its customers to buy lottery tickets. In other words, PowerPick's customers pay an amount substantially in excess of the face value of the lottery tickets that PowerPick actually purchases. One reason for this is certainly the customers' desire to pay for PowerPick's alleged services.[2] But we conclude that

---

[2] As explained previously, PowerPick asserts that it provides several valuable services to its customers, such as eliminating the need for its

another reason for these payments substantially in excess of the face value of the lottery tickets is to *buy the chance* of being assigned to one or more winning pools by PowerPick.

PowerPick admits that it uses a computer system to randomly assign each customer to a particular pool of the type that he or she has chosen. These random assignments plainly introduce an additional element of chance into the PowerPick scheme. By way of example, assume that there are 200 PowerPick customers at any given time who have chosen the Keno PowerPool option. Further assume that each of these customers has purchased only one share. Because the Keno Power-Pools consist of 10 shares each, PowerPick would create 20 Keno PowerPools with 10 shares each, randomly assigning each of the 200 customers to one of these pools. Rather than purchasing one large set of Keno tickets to be shared equally among all 200 customers, PowerPick will purchase 20 small sets of Keno tickets, and will assign one of these small sets to each of the 20 pools. Thus, any individual customer who has chosen the Keno PowerPool option will have a chance of sharing in a winning ticket *only* within the confines of the small set of Keno tickets held by his or her 10-share pool. In contrast, if PowerPick had purchased one large set of Keno tickets to be shared equally among all 200 customers, any individual customer would have had a much greater chance of sharing in a winning Keno ticket.

As can be seen, the random assignment of customers to the individual PowerPools clearly injects an addi-

customers to wait in line, holding the lottery tickets in trust, ensuring that none of the lottery tickets is lost, sending out confirmation certificates, checking the tickets for winnings, mailing out winnings statements, and overseeing the collection and distribution of all winnings.

tional element of uncertainty into a customer's chance of sharing in a winning ticket. PowerPick's customers plainly "bet" on the outcome of these random computerized assignments. " 'Betting in common speech means the putting of a certain sum of money or other valuable thing at stake on the happening or not happening of some uncertain event.' " *Michigan ex rel Comm'r of State Police v One Helix Game*, 122 Mich App 148, 155; 333 NW2d 24 (1982), quoting *Shaw v Clark*, 49 Mich 384, 388; 13 NW 786 (1882). PowerPick's assignment of a customer to one PowerPool over another is clearly an "uncertain event" upon which money is put at stake. Customers do not only bet that the lottery tickets purchased by PowerPick will win; they also bet that their specific pool will hold the winning ticket or tickets. We conclude that a portion of the money paid by each PowerPick customer is put at stake in the hope that the customer will be randomly assigned to at least one pool that holds a winning ticket. Such a scheme is clearly encompassed within the definition of "betting." *One Helix Game*, 122 Mich App at 155.

Pursuant to MCL 750.301, "[a]ny person or his or her agent or employee who, directly or indirectly, takes, receives, or accepts . . . any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person . . . contingent . . . upon the happening of any event not known by the parties to be certain, is guilty of a misdemeanor . . . ." The legislative goal underlying MCL 750.301 was the suppression of betting. *Michigan ex rel Comm'r of State Police v Nine Money Fall Games*, 130 Mich App 414, 419; 343 NW2d 576 (1983). The statute prohibits private betting between consenting parties, and is not limited to combating only the effects of organized and commercialized gambling. *Oakland Co Prosecutor v 46th Dist Judge*, 76 Mich App

318, 325-326; 256 NW2d 776 (1977). After applying the plain statutory language, it is clear to us that Power-Pick's PowerPools violate MCL 750.301. As discussed previously, PowerPick accepts money from its customers not only with the express understanding that lottery tickets will be purchased, *but also with the express understanding that a valuable prize will be paid out to any customer who is randomly assigned to a pool holding a winning lottery ticket*. MCL 750.301 directly prohibits the acceptance of money on the happening or not happening of such an uncertain event.[3]

PowerPick also "registers" these bets in violation of MCL 750.304. Pursuant to MCL 750.304, "[a]ny person or his or her agent or employee . . . who registers bets . . . is guilty of a misdemeanor . . . ." We have already explained that PowerPick accepts "bets" when its customers put money at stake for the chance of being randomly assigned to at least one pool that holds a winning ticket. See *One Helix Game*, 122 Mich App at 155. We conclude that by accepting these bets from its customers, randomly assigning its customers to pools in exchange for their bets, and sending out written confirmation certificates verifying these random assignments, PowerPick "registers bets" in violation of MCL 750.304.

We also conclude that PowerPick possesses "memoranda of . . . bet[s]" in violation of MCL 750.306. Under MCL 750.306, "[a]ll . . . memoranda of any . . . bet, manifold, or other policy or pool books or sheets are . . . declared a common nuisance and the possession of 1 or more of those items is a misdemeanor . . . ." The

---

[3] It is irrelevant that the underlying Michigan Lottery tickets are, themselves, issued as part of a legal lottery. See *People v Weithoff*, 51 Mich 203, 212; 16 NW 442 (1883). Even when a game is itself legal, "the betting upon the game . . . constitutes gaming, and those [who] game or gamble . . . thus bet." *Id.*

written confirmation certificates sent by PowerPick to its customers are, in essence, receipts. The certificates verify that the customers have been randomly assigned to one or more pools in exchange for their bets. Power-Pick's confirmation certificates, which memorialize these betting transactions, therefore constitute "memo-randa of . . . bet[s]" within the meaning of MCL 750.306. See *People v Taylor*, 89 Mich App 238, 242; 280 NW2d 500 (1979) (observing that MCL 750.306 prohib-its the "possession of various written memoranda used in gambling operations").

2

PowerPick also violates MCL 432.27 by reselling lottery tickets to its customers and by charging a price greater than that fixed by the Michigan Lottery com-missioner. MCL 432.27(1) provides:

> A person shall not sell a ticket or share at a price greater than that fixed by rule of the commissioner. A person other than a licensed lottery sales agent shall not sell lottery tickets or shares. This section shall not be construed to prevent a person from giving lottery tickets or shares to another as a gift.

PowerPick argues that it is merely an "agent" for its customers, and that it buys Michigan Lottery tickets directly on their behalf. Indeed, PowerPick asserts that because of this agency relationship, title in the lottery tickets passes directly from the state of Michigan to the individual customers at the time the tickets are pur-chased. We are unconvinced by PowerPick's argument in this regard, and conclude that PowerPick "sell[s] lottery tickets or shares" to its customers within the meaning of MCL 432.27(1). We find particularly persua-sive the reasoning of the Attorney General in OAG,

1985-1986, No 6392, pp 382, 384 (October 7, 1986), which addressed a similar question arising under MCL 432.27(1):

> The final sentence of [MCL 432.27(1)], exempting gifts of lottery tickets, is of particular significance and indicates a clear legislative intent that the prohibition against sales by persons who are not licensed agents is to be read broadly. The fact that the Legislature expressly excluded gift transactions from the prohibition set forth in § 27(1) demonstrates that the Legislature viewed this prohibition as being sufficiently broad so as to include even gifts had they not been expressly excluded by that final sentence. If third-party transfers in the form of gifts would be barred in the absence of the express exemption in § 27(1), *certainly for-profit third-party transfers would also be barred.*
>
> This conclusion is further supported by application of the well-established maxim of statutory construction known as the *expressio uniu[s] est exclusio alterius,* i.e., that express mention in a statute of one thing implies the exclusion of other similar things. *See, e.g., Stowers v Wolodzko,* 386 Mich 119, 133; 191 NW2d 355 (1971). The fact that the Legislature expressly exempted third-party transfers of lottery tickets which take the form of a gift, but did not expressly exempt for-profit third-party transfers such as that proposed here, manifests the legislative intent that the latter type of transaction not be permitted. [Emphasis added.]

"Although Attorney General opinions are not binding on this Court, they can be persuasive authority." *Lysogorski v Bridgeport Charter Twp,* 256 Mich App 297, 301; 662 NW2d 108 (2003); see also *Williams v Rochester Hills,* 243 Mich App 539, 557; 625 NW2d 64 (2000). We agree with the Attorney General's observation that the Legislature must have viewed the general prohibition of MCL 432.27(1) as sufficiently broad to encompass even gifts. Otherwise, if the Legislature had believed that gifts already fell outside the scope of the general prohibition,

the final sentence of MCL 432.27(1) would have been superfluous and unnecessary. It is a basic tenet of statutory construction that no language in a statute should be interpreted as unnecessary surplusage. *In re Kiogima*, 189 Mich App 6, 13; 472 NW2d 13 (1991); see also *Apsey v Mem Hosp*, 477 Mich 120, 127; 730 NW2d 695 (2007). Indeed, courts presume that every statutory word and phrase has some meaning and must give effect to each provision of the statute if possible. *Danse Corp v Madison Hts*, 466 Mich 175, 182; 644 NW2d 721 (2002). "It is presumed that the Legislature is aware of the rules of statutory construction and has drafted its enactments accordingly." *Michigan Employment Security Comm v Westphal*, 214 Mich App 261, 264; 542 NW2d 360 (1995).

In light of this authority, it is clear that the Legislature would not have included the final sentence of MCL 432.27(1) if that provision had constituted mere surplusage. And if the Legislature believed that the general prohibition of MCL 432.27(1) was sufficiently broad to encompass gifts in the absence of the final sentence, it necessarily follows that the general prohibition of MCL 432.27(1) encompasses "for-profit third-party transfers," as explained in OAG, 1985-1986, No 6392, p 384. We agree with the reasoning of OAG, 1985-1986, No 6392, and therefore find it persuasive on this issue. See *Risk v Lincoln Charter Twp Bd of Trustees*, 279 Mich App 389, 398-399; 760 NW2d 510 (2008).

As noted in OAG, 1985-1986, No 6392, p 384, the Legislature intended "that the prohibition against sales by persons who are not licensed agents is to be read broadly." It is undisputed that PowerPick is not "a licensed lottery sales agent" and that PowerPick operates a for-profit business. When PowerPick accepts payments substantially in excess of the cost of the

lottery tickets it purchases, and then transfers those lottery tickets to its paying customers, it is engaged in what the Attorney General has described as "for-profit third-party transfers[.]" *Id.* We therefore conclude that PowerPick "sell[s] lottery tickets or shares" in violation of MCL 432.27(1).

Having determined that PowerPick "sell[s]" lottery tickets to its customers, it cannot be seriously disputed that PowerPick sells them "at a price greater than that fixed by rule of the commissioner" within the meaning of MCL 432.27(1). Indeed, although PowerPick describes itself as a simple "lottery club," it admits that it uses only 51 percent of the money collected from its customers to buy lottery tickets and that its customers pay an amount substantially in excess of the face value of the lottery tickets that are ultimately purchased. No further proof is necessary for us to conclude that PowerPick sells lottery tickets to its customers "at a price greater than that fixed by rule of the commissioner." MCL 432.27(1).

3

In addition, PowerPick's periodic random drawings for Michigan Lottery scratch-off tickets constitute an illegal lottery within the meaning of MCL 750.372, and PowerPick's MegaPools constitute an illegal gift enterprise within the meaning of MCL 750.372.

As an initial matter, we note that neither the term "lottery" nor the term "gift enterprise" is defined in MCL 750.372. We must give statutory words and phrases their commonly understood meanings. MCL 8.3a; *Lewandowski v Nuclear Mgt Co, LLC*, 272 Mich App 120, 126; 724 NW2d 718 (2006). When a term is not defined by statute, it is appropriate for this Court to look to dictionary definitions. *People v Stone*, 463 Mich

558, 563; 621 NW2d 702 (2001); *Stocker v Tri-Mount/Bay Harbor Bldg Co, Inc*, 268 Mich App 194, 199; 706 NW2d 878 (2005). "[B]ut technical words and phrases, and such as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning." MCL 8.3a; see also *Bay Co Prosecutor v Nugent*, 276 Mich App 183, 190; 740 NW2d 678 (2007). It is also appropriate for us to consider how a word or phrase has been defined in the previous caselaw. See *Roby v Mt Clemens*, 274 Mich App 26, 30; 731 NW2d 494 (2007).

The word "lottery" is "commonly defined as 'a gambling game or method of raising money in which a large number of tickets are sold and a drawing is held for prizes,' 'a drawing of lots,' and 'any happening or process that is or appears to be determined by chance . . . .' " *FACE Trading, Inc v Dep't of Consumer & Industry Services*, 270 Mich App 653, 666; 717 NW2d 377 (2006), quoting *Random House Webster's College Dictionary* (1997). Our Supreme Court has explained that "the essentials of a lottery [a]re 'consideration, prize, and chance.' " *Rohan v Detroit Racing Ass'n*, 314 Mich 326, 344; 22 NW2d 433 (1946), quoting *Glover v Malloska*, 238 Mich 216, 219; 213 NW 107 (1927); see also *People v Welch*, 269 Mich 449, 452; 257 NW 859 (1934). However, "[w]hile consideration, prize, and chance are often common factors found in a lottery, . . . the term 'lottery' must be construed broadly." *FACE Trading, Inc*, 270 Mich App at 667. " '[T]he word "lottery" must be construed in the popular sense, with the view of remedying the mischief intended to be prevented, and to suppress all evasions for the continuance of the mischief.' " *Id.*, quoting *People v McPhee*, 139 Mich 687, 690; 103 NW 174 (1905). "Thus, while the Supreme Court has indicated that the essentials of

a lottery generally are consideration, prize, and chance, these essentials cannot be used to frustrate the plain and ordinary meaning of the word 'lottery.' " *FACE Trading, Inc*, 270 Mich App at 668.

In *Sproat-Temple Theatre Corp v Colonial Theatrical Enterprise, Inc*, 276 Mich 127; 267 NW 602 (1936), our Supreme Court considered the traditional elements of consideration, prize, and chance to determine whether a drawing held at the defendants' theaters constituted a "lottery" under Michigan law. Each patron who purchased an admission ticket at the defendants' theaters was "given a coupon ticket bearing duplicate numbers . . . ." *Id*. at 128. When the patron entered the theater, "one-half of each coupon ticket [was] dropped in a barrel by the purchaser and the other half [was] retained by him[.]" *Id*. "[A]t an advertised time the barrel containing the coupon tickets was taken upon the stage of the theatre and several tickets were withdrawn therefrom. The person holding the coupon or stub with the number corresponding to the number on the ticket drawn from the barrel was given a valuable money prize." *Id*. at 128-129.

The plaintiffs argued that the drawings constituted an enjoinable "lottery" within the meaning of what is now MCL 750.372. *Sproat-Temple Theatre*, 276 Mich at 129. The defendants countered, contending that because each patron received a coupon ticket at no additional cost, there could be no "lottery." *Id*. In particular, the defendants argued that because "the patron pays nothing for a chance to receive the prize, no consideration runs from the public, and, therefore, the [lottery] statute is not violated." *Id*.

Our Supreme Court disagreed with the defendants, observing that " 'while the patrons may not pay, and the [defendants] may not receive, any direct consideration

[for the coupon tickets], there is an indirect consideration paid and received. The fact that prizes . . . are to be distributed will attract persons to the theatres who would not otherwise attend. In this manner those obtaining prizes pay consideration for them, and the theatres reap a direct financial benefit.' " *Id.* at 130-131, quoting *Society Theatre v City of Seattle*, 118 Wash 258, 260; 203 P 21 (1922). Accordingly, the Supreme Court affirmed the circuit court's order enjoining the defendants' scheme as an illegal lottery. *Sproat-Temple Theatre*, 276 Mich at 131.

The next year, a similar fact pattern was presented in *United-Detroit Theaters Corp v Colonial Theatrical Enterprise, Inc*, 280 Mich 425; 273 NW 756 (1937). Our Supreme Court again looked to the traditional elements of consideration, prize, and chance—this time for the purpose of determining whether a "screeno" game played at the defendants' theaters constituted a "lottery" within the meaning of what is now MCL 750.372. *United-Detroit Theaters*, 280 Mich at 427-429. A free screeno card was given to each patron who bought a ticket for admission to one of the defendants' theaters. *Id.* at 427. But unlike the coupon tickets at issue in *Sproat-Temple Theatre*, the screeno cards in *United-Detroit Theaters* were "not confined to purchasers of admission tickets . . . ." *United-Detroit Theaters*, 280 Mich at 427. Instead, free screeno cards were also available "upon request to any person in the foyer of the theater or to persons on the sidewalk in front of the theater." *Id.* Each screeno card contained a series of random numbers, which were arranged in rows and columns. The first person to match certain of the numbers on his or her screeno card with those displayed on the theater screen won a prize. *Id.*

The plaintiff, a competing theater owner, argued that the screeno game constituted an enjoinable "lottery" under the statute. *Id.* at 428. Although the screeno tickets were distributed for free and were available to patrons and nonpatrons alike, the Supreme Court relied on *Sproat-Temple Theatre* to find that the element of consideration had been established, observing that "the distribution of the tickets unquestionably attracted others to the theater who otherwise would not have attended and in this way the theater owner profited thereby. This is a sufficient consideration." *Id.* at 429.

Also unlike the facts of *Sproat-Temple Theatre*, a small amount of skill was apparently necessary to play the screeno game at issue in *United-Detroit Theaters*. Nevertheless, the *United-Detroit Theaters* Court found that the screeno game retained the element of chance, stating that "[a]n examination of the method used in the conducting of the game must convince any one that the element of skill as compared with the element of chance is slight." *Id.*

In light of this authority, we are compelled to conclude that PowerPick's periodic drawings for Michigan Lottery scratch-off tickets constitute a "lottery" within the meaning of MCL 750.372. PowerPick, through its newsletter, periodically invites its customers to participate in drawings for Michigan Lottery scratch-off tickets. As explained previously, one such contest asked PowerPick's customers to count the "Shamrocks hidden" within the newsletter and send in their count. The newsletter announced that "[t]he first three randomly drawn with the correct answer will each win 10 of the $10 Take Home Millions scratch tickets." In another recent game, newsletter readers were asked to count the total number of times the word "pumpkin" ap-

peared within the text and to submit their count. The newsletter went on to state:

> Anytime you see that word within the pages of this newsletter, whether it's singular or plural, capital letters or lower case, part of another word or standing alone . . . count it.

\* \* \*

> Remember that this is a bi-monthly drawing, so all entries received by November 30, 2009, will be eligible to win. On December 1, 2009, the winners will be randomly drawn from those who submitted the correct answer. The first 3 drawn with the correct answer will each win $100 worth of the Classic Casino instant tickets and you'll be well on your way to scratching off some winners. There is no purchase necessary to win, but you must be 18 years of age.

PowerPick's periodic drawings for Michigan Lottery scratch-off tickets clearly fall within the definition of a "lottery." These periodic drawings are not only " 'a drawing of lots,' " but are also a " 'process that is . . . determined by chance . . . .' " *FACE Trading, Inc*, 270 Mich App at 666, quoting *Random House Webster's, supra*. Moreover, these periodic drawings include all three traditional elements of a lottery. With respect to the element of consideration, although the periodic drawings are widely announced in PowerPick's newsletter and are available at no additional cost to the newsletter's readers, they are clearly used to induce people to become PowerPick customers or to remain PowerPick customers. In other words, the periodic drawings for Michigan Lottery scratch-off tickets "unquestionably attracted others to [PowerPick] who otherwise would not have [become PowerPick customers] and in this way [PowerPick] profited thereby. This is a sufficient consideration." *United-Detroit Theaters*, 280

Mich at 429; see also *Sproat-Temple Theatre*, 276 Mich at 130-131. With respect to the element of chance, it is true that some modicum of skill may be required for an individual to accurately count the "Shamrocks hidden" within the newsletter or the number of times the word "pumpkin" occurs within the text. However, despite the fact that an individual must first submit an accurate count to participate, PowerPick ultimately awards the scratch-off tickets on the basis of a random drawing. Accordingly, the drawings retain the essence of a game of chance, and "the element of skill as compared with the element of chance is slight." *United-Detroit Theaters*, 280 Mich at 429. PowerPick, itself, admits the third element—that a prize is awarded to the winners of the random drawings. Lest there be any doubt that a scratch-off lottery ticket can constitute a prize, we note that although an unscratched instant lottery ticket generally has "little or no actual monetary worth," it certainly can have a great deal of *"potential* value . . . ." See *McDougal v McDougal*, 451 Mich 80, 82; 545 NW2d 357 (1996) (emphasis in original). This, we think, is all that is required to constitute a prize. We conclude that PowerPick's periodic random drawings for Michigan Lottery scratch-off tickets are a "lottery" within the meaning of MCL 750.372.

The term "gift enterprise" has been used for more than 100 years in Michigan's statutes, see, e.g., *McPhee*, 139 Mich at 688-689; *People v Reilly*, 50 Mich 384, 387-388; 15 NW 520 (1883), and indeed appears to have acquired a particular meaning in the law, see MCL 8.3a. Black's Law Dictionary (7th ed) defines "gift enterprise" as, among other things, "[a] merchant's scheme to induce sales . . . by giving buyers tickets that carry a chance to win a prize." As noted previously, Power-Pick's MegaPools are announced as "a FREE bonus and . . . in addition to each player's PowerPool." Each

PowerPick customer is automatically entered in one of the MegaPools for each Mega Millions drawing, as long as he or she is a participant in one of the main PowerPool packages.

These MegaPools, like the periodic drawings for scratch-off tickets described previously, are clearly used to induce people to become PowerPick customers or to remain PowerPick customers. Each PowerPick customer is entered into one of the MegaPools as "a FREE bonus," thereby receiving shares in a pool of Mega Millions tickets at no additional cost. PowerPick's MegaPools plainly constitute "[a] merchant's scheme to induce sales . . . by giving buyers tickets that carry a chance to win a prize." Black's Law Dictionary (7th ed). Therefore, we conclude that the MegaPools are a "gift enterprise" within the meaning of MCL 750.372.

Having determined that PowerPick's periodic drawings for Michigan Lottery scratch-off tickets constitute a "lottery" and that PowerPick's MegaPools constitute a "gift enterprise," we turn to the question whether PowerPick violates the provisions of MCL 750.372 by conducting and promoting these schemes. We conclude that it does.

It is unlawful in this state to "[s]et up or promote . . . any lottery or gift enterprise for money" and to "[a]id, either by printing or writing, or in any way be concerned in the setting up, managing, or drawing of a lottery or gift enterprise." MCL 750.372(1)(a) and (c). PowerPick violates these provisions through the operation of its periodic drawings for Michigan Lottery scratch-off tickets and its MegaPools. First, both the periodic drawings for scratch-off tickets and the MegaPools violate MCL 750.372(1)(a). We have already noted that these enterprises are intended to entice people to become or to remain *paying* customers of PowerPick.

Therefore, it cannot be seriously disputed that they are "[s]et up or promote[d] ... for money" within the meaning of MCL 750.372(1)(a). Furthermore, both the periodic drawings for scratch-off tickets and the Mega-Pools were devised and are operated by PowerPick. Accordingly, by "setting up" and "managing" the periodic drawings for scratch-off tickets and the MegaPools, PowerPick unquestionably violates MCL 750.372(1)(c) as well.[4]

---

4

As our Supreme Court observed 40 years ago in *Attorney General, ex rel Optometry Bd of Examiners v Peterson*, 381 Mich 445, 465-466; 164 NW2d 43 (1969):

> At common law, acts in violation of law constitute a public nuisance. Harm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare. The attorney general, acting on behalf of the people, is a proper party to bring an action to abate a public nuisance or restrain unlawful acts which constitute a public nuisance.

PowerPick's various gaming schemes violate the terms of MCL 432.27(1), MCL 750.301, MCL 750.304, MCL 750.306, and MCL 750.372. Michigan's lottery and

---

[4] We fully acknowledge that the prohibition of lotteries and gift enterprises contained in MCL 750.372(1) "does not apply to a lottery or gift enterprise conducted by a person as a promotional activity that is clearly occasional and ancillary to the primary business of that person." MCL 750.372(2). However, a lottery or gift enterprise is not a "promotional activity" within the meaning of the statute if it "may be entered by purchasing a product or service for substantially more than its fair market value." *Id*. Because PowerPick's customers pay "substantially more than [the] fair market value" of the lottery tickets that PowerPick ultimately purchases, we conclude that the periodic drawings for scratch-off tickets and the MegaPools are not a "promotional activity." *Id*. Accordingly, these enterprises are not exempt from the provisions of MCL 750.372(1). MCL 750.372(2).

gambling statutes were validly enacted to preserve the public safety, morals, and welfare. See *Parkes v Recorder's Court Judge*, 236 Mich 460, 466-467; 210 NW 492 (1926); see also *Oakland Co Prosecutor*, 76 Mich App at 330. Indeed, "[t]he Legislature has the right to conclude that gambling is injurious to the morals and welfare of the people and it is clearly within the scope of the state police power to suppress gambling in all of its forms." *Id.* at 326. Because PowerPick's business activities violate these validly enacted statutes, "[h]arm to the public is presumed to flow" from PowerPick's operations. *Peterson*, 381 Mich at 465. We conclude that PowerPick's business operations, taken as a whole, constitute a public nuisance. *Id.*

5

We also conclude that PowerPick's office in Comstock Park and "the furniture, fixtures, and contents" of that office constitute a nuisance as a matter of law. The Legislature has declared that "[a]ny building, vehicle, boat, aircraft, or place used for the purpose of . . . gambling" is an enjoinable nuisance. MCL 600.3801. Moreover, "the furniture, fixtures, and contents of the building, vehicle, boat, aircraft, or place" are also declared to be an enjoinable nuisance. *Id.* The Legislature has specifically authorized the Attorney General to "maintain an action for equitable relief in the name of the state of Michigan . . . to abate said nuisance and to perpetually enjoin any person, his servant, agent, or employee, who shall own, lease, conduct or maintain such building, vehicle, boat, aircraft or place, from permitting or suffering such building, vehicle, boat, or aircraft or place . . . , or any other building, vehicle, boat, aircraft or place conducted or maintained by him to be used for [gambling]." MCL 600.3805.

It is first necessary to determine whether Power-Pick's operations constitute "gambling" within the meaning of MCL 600.3801. We acknowledge that the word "gambling" is not defined in MCL 600.3801. However, at common law, the definition "require[d] the presence of three elements: (1) price or consideration, (2) chance, and (3) prize or reward." *Automatic Music & Vending Corp v Liquor Control Comm*, 426 Mich 452, 457; 396 NW2d 204 (1986).[5] We have no trouble concluding that PowerPick engages in "gambling" within the meaning of MCL 600.3801. We determined earlier that PowerPick's PowerPool scheme is a variety of "betting," *One Helix Game*, 122 Mich App at 155, and that it is prohibited under MCL 750.301. MCL 750.301, which prohibits betting on uncertain events, MCL 750.304, which prohibits among other things "registering bets," and MCL 750.306, which prohibits among other things possessing "memoranda of . . . bet[s]," are all contained within Chapter 44 of the Penal Code, MCL 750.301 *et seq.*, which is entitled "Gambling." The particular placement of these provisions in the overall statutory scheme suggests that betting, registering bets, and keeping memoranda of bets are all forms of "gambling." See *Tallman v Dep't of Natural Resources*, 421 Mich 585, 600; 365 NW2d 724 (1984). Moreover, our Supreme Court has recognized that it would not be "an inaccurate or inappropriate use of language if all betting for money were to be spoken of and considered as gaming or gambling." *People v Weithoff*, 51 Mich 203, 210; 16 NW 442 (1883). We are persuaded that Power-

---

[5] The *Automatic Music & Vending* Court actually construed the word "gaming" rather than the word "gambling." *Automatic Music & Vending*, 426 Mich at 457. However, the Court explained that "the terms 'gaming' and 'gambling' are synonymous, [and] are used interchangeably." *Id.* at 457 n 1; see also *People v Weithoff*, 51 Mich 203, 210-211; 16 NW 442 (1883) (using the terms "gaming" and "gambling" interchangeably).

Pick's betting scheme plainly constitutes a variety of "gambling" within the meaning of MCL 600.3801.

We are similarly persuaded that PowerPick's periodic drawings for Michigan Lottery scratch-off tickets constitute "gambling" under MCL 600.3801. We previously concluded that PowerPick's periodic drawings for scratch-off tickets constitute a "lottery." The common-law elements of "gaming" or "gambling"—price or consideration, chance, and prize or reward, *Automatic Music & Vending*, 426 Mich at 457—are remarkably similar to the common-law elements of a "lottery"— consideration, prize, and chance, *Rohan*, 314 Mich at 344; *Glover*, 238 Mich at 219. Indeed, our Supreme Court has described a lottery as " 'a species of gambling . . . .' " *Rohan*, 314 Mich at 344 (citation omitted); see also *FACE Trading, Inc*, 270 Mich App at 666 (observing that " '[l]ottery' is commonly defined as 'a gambling game or method' "). We conclude that Power-Pick's periodic drawings for scratch-off lottery tickets constitute "gambling" within the meaning of MCL 600.3801.

All that remains is to determine whether PowerPick "owns, leases, conducts, or maintains" "[a]ny building, vehicle, boat, aircraft, or place used for the purpose of . . . gambling" within the meaning of MCL 600.3801. We find that it does. It is undisputed that PowerPick leases or otherwise maintains an office in Comstock Park from which its Michigan business operations are carried out. PowerPick receives payments from Power-Pool participants at its Comstock Park office, and accordingly accepts bets there. See *State, ex rel Washtenaw Co Prosecuting Attorney v Western Union Tel Co*, 336 Mich 84, 89; 57 NW2d 537 (1953). This is confirmed by PowerPick's own website, which directs potential PowerPick customers to "mail in your order" to "4673

West River Drive NE, Comstock Park, MI 49321."
Moreover, PowerPick unquestionably manages and pro-
motes its periodic drawings for Michigan Lottery
scratch-off tickets from its Comstock Park office. Thus,
even if PowerPick does not hold the actual drawings at
its office, it nonetheless promotes its lottery from that
place. See *People v Elliott*, 74 Mich 264, 268; 41 NW 916
(1889). We conclude that PowerPick's Comstock Park
office is a building or place "used for the purpose
of . . . gambling" under MCL 600.3801. Accordingly,
PowerPick's Comstock Park office, as well as "the
furniture, fixtures, and contents" of that office, consti-
tute an enjoinable nuisance. MCL 600.3801.

6

The Attorney General was entitled to judgment as a
matter of law with respect to his nuisance claim. Not only
do PowerPick's betting, lottery, and gift enterprise
schemes constitute an enjoinable public nuisance under
the reasoning of *Peterson*, 381 Mich at 465,[6] but Power-
Pick's Comstock Park office, as well as "the furniture,
fixtures, and contents" of that office, constitute an
enjoinable nuisance under MCL 600.3801.

III

PowerPick raised several affirmative defenses to the

---

[6] We fully acknowledge that several of the statutes violated by Power-
Pick, including MCL 750.301, MCL 750.304, MCL 750.306, and MCL
750.372, are criminal in nature and are contained in the Penal Code,
MCL 750.1 *et seq.* In general, equity will not enjoin the commission of a
crime because a chancellor has no criminal jurisdiction. *United-Detroit
Theaters*, 280 Mich at 429-430; see also *Western Union Tel Co*, 336 Mich
at 90. However, when criminal acts independently rise to the level of
nuisances, "the jurisdiction of a court of equity arises," *United-Detroit
Theaters*, 280 Mich at 430 (quotation marks and citations omitted), and
the acts may be enjoined, *Western Union Tel Co*, 336 Mich at 90.

Attorney General's complaint. Specifically, PowerPick contended that the Attorney General had failed to state a claim on which relief could be granted. It further asserted that the complaint should have been dismissed under the doctrines of equal protection, laches, and unclean hands. The Attorney General argues that the circuit court erred by denying his motion for summary disposition of these affirmative defenses pursuant to MCR 2.116(C)(9). We agree with the Attorney General.

A

The circuit court's ruling on a motion for summary disposition is reviewed de novo. *Dressel*, 468 Mich at 561. "Summary disposition under MCR 2.116(C)(9) is proper if a defendant fails to plead a valid defense to a claim." *Dimondale v Grable*, 240 Mich App 553, 564; 618 NW2d 23 (2000). The motion should be granted "[i]f the defenses are ' "so clearly untenable as a matter of law that no factual development could possibly deny plaintiff's right to recovery[.]" ' " *Id.* (citations omitted).

B

We reject PowerPick's assertion that the Attorney General failed to state a claim on which relief could be granted. As noted previously, "[t]he attorney general, acting on behalf of the people, is a proper party to bring an action to abate a public nuisance or restrain unlawful acts which constitute a public nuisance." *Peterson*, 381 Mich at 465-466; see also *People ex rel Oakland Co Prosecuting Attorney v Kevorkian*, 210 Mich App 601, 607; 534 NW2d 172 (1995). A review of the pleadings reveals that the Attorney General properly pleaded and

supported his allegations of nuisance and unlawful gambling. PowerPick's claim in this regard must fail.

C

PowerPick also argued that the Attorney General's complaint should have been dismissed on the basis of the constitutional guarantee of equal protection. In particular, PowerPick asserted that it has been treated differently than similarly situated entities, which were allowed to continue operating in Michigan and had not been sued by the Attorney General. We disagree. PowerPick has failed to show that any other similarly situated entities are operating in Michigan. As explained earlier, whereas a typical office lottery club uses *all* the money contributed by its members to purchase commonly held lottery tickets, PowerPick admits that it uses only 51 percent of the money that it collects from its customers to buy lottery tickets. PowerPick has not demonstrated the existence of any other Michigan entity that charges its customers an amount substantially in excess of the face value of the lottery tickets purchased in this manner. Accordingly, PowerPick has failed to show that it has been treated differently than any other similarly situated entity. *People v Mouradian*, 110 Mich App 815, 822; 314 NW2d 494 (1981). " '[E]qual protection does not require the same treatment be given those that are not similarly situated.' " *Champion v Secretary of State*, 281 Mich App 307, 325; 761 NW2d 747 (2008), quoting *Alspaugh v Comm on Law Enforcement Standards*, 246 Mich App 547, 555; 634 NW2d 161 (2001).

D

We similarly reject PowerPick's assertion that the Attorney General's complaint should have been dis-

missed on the basis of laches. Laches is an affirmative
defense based primarily on circumstances that render
it inequitable to grant relief to a dilatory plaintiff.
*Yankee Springs Twp v Fox*, 264 Mich App 604, 611;
692 NW2d 728 (2004). The doctrine of laches is
triggered by the plaintiff's failure to do something
that should have been done under the circumstances
or failure to claim or enforce a right at the proper
time. *Schmude Oil Co v Omar Operating Co*, 184 Mich
App 574, 583; 458 NW2d 659 (1990). "The doctrine of
laches is founded upon long inaction to assert a right,
attended by such intermediate change of conditions
as renders it inequitable to enforce the right." *An-
geloff v Smith*, 254 Mich 99, 101; 235 NW 823 (1931).
But "[i]t has long been held that the mere lapse of
time will not, in itself, constitute laches." *Dep't of
Treasury v Campbell*, 107 Mich App 561, 570; 309
NW2d 668 (1981). "The defense, to be raised properly,
must be accompanied by a finding that the delay
caused some prejudice to the party asserting laches
and that it would be inequitable to ignore the preju-
dice so created." *Id*. The defendant bears the burden
of proving this resultant prejudice. *Yankee Springs
Twp*, 264 Mich App at 612.

As the Attorney General correctly points out, the
early rule was that the government was " 'exempt from
the consequences of its laches . . . .' " *Detroit v 19675
Hasse*, 258 Mich App 438, 445; 671 NW2d 150 (2003),
quoting *Guaranty Trust Co v United States*, 304 US 126,
132; 58 S Ct 785; 82 L Ed 1224 (1938); see also
*Chippewa Co Bd of Supervisors v Bennett*, 185 Mich
544, 564-565; 152 NW 229 (1915). However, this ancient
rule has apparently been abrogated in Michigan, at
least in part. See *Royal Oak Twp v School Dist No 7*,
322 Mich 397, 402-403; 33 NW2d 908 (1948). At least
one panel of this Court has cited the *Royal Oak Twp*

decision for the proposition that "laches should
... be ... available to an individual responding to a
government initiated action." *Dep't of Treasury*, 107
Mich App at 570.

Nevertheless, even if laches may be asserted
against a governmental entity, we conclude that the
equitable defense of laches was unavailable to Pow-
erPick because PowerPick acted with unclean hands.
Laches is an equitable doctrine. *Baerlin v Gulf Refin-
ing Co*, 356 Mich 532, 535; 96 NW2d 806 (1959);
*Eberhard v Harper-Grace Hospitals*, 179 Mich App 24,
35; 445 NW2d 469 (1989). It is well settled that one
who seeks equitable relief must do so with clean
hands. *McCluskey v Winisky*, 373 Mich 315, 321; 129
NW2d 400 (1964); *Berar Enterprises, Inc v Harmon*,
101 Mich App 216, 231; 300 NW2d 519 (1980). A
party with unclean hands may not assert the equi-
table defense of laches. *Attorney General v Thomas
Solvent Co*, 146 Mich App 55, 66; 380 NW2d 53 (1985).
Our Supreme Court has observed that a party who
has "acted in violation of the law" is not "before a
court of equity with clean hands," and is therefore
"not in position to ask for any remedy in a court of
equity." *Farrar v Lonsby Lumber & Coal Co*, 149 Mich
118, 121; 112 NW 726 (1907). Indeed, as stated in
*Society of Good Neighbors v Mayor of Detroit*, 324 Mich
22, 28; 36 NW2d 308 (1949), a court of equity "will
not lend its aid ... to assist law violators." Power-
Pick's various gambling schemes violate the terms of
MCL 432.27(1), MCL 750.301, MCL 750.304, MCL
750.306, and MCL 750.372, and PowerPick has thus
acted with unclean hands. *Farrar*, 149 Mich at 121.
As a consequence, it may not assert the equitable
defense of laches. *Thomas Solvent*, 146 Mich App at
66.

E

For the same reason, PowerPick was not entitled to assert the equitable defense of unclean hands. A defendant with unclean hands may not defend on the ground that the plaintiff has unclean hands as well. To permit a defendant with unclean hands to defend on such a ground would contravene the ancient rule that "[h]e who hath committed iniquity shall not have equity . . . ." *Society of Good Neighbors*, 324 Mich at 28; see also *McCredie v Buxton*, 31 Mich 383, 388 (1875).

F

PowerPick's affirmative defenses fail as a matter of law. The circuit court should have granted the Attorney General's motion for summary disposition of the affirmative defenses under MCR 2.116(C)(9). *Dimondale*, 240 Mich App at 564.

IV

In ruling on the motion for summary disposition, the circuit court did not address the Attorney General's claim that PowerPick's operations violated the MCPA. In general, we will not address an issue on appeal that was not considered and decided below. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 95; 693 NW2d 170 (2005); *People v Hall*, 158 Mich App 194, 199; 404 NW2d 219 (1987). Lest there be any confusion on the matter, we wish to make clear that PowerPick's operations constituted an enjoinable nuisance for the reasons stated above, irrespective of whether PowerPick's business practices also violated the MCPA. However, because the Attorney General sought civil fines, costs, and other specific relief under the MCPA, see MCL 445.905(1); MCL 445.905(4), we direct

the circuit court to consider and address the Attorney
General's MCPA claim on remand.

V

We have concluded that PowerPick's operations and
office constitute an enjoinable nuisance and that Pow-
erPick failed to plead and assert any valid affirmative
defenses. Therefore, the circuit court erred by denying
the Attorney General's motion for summary disposition
with respect to his nuisance claim. There remained no
genuine issue of material fact that would have pre-
cluded the grant of summary disposition on this issue,
and the Attorney General was entitled to judgment as a
matter of law. On remand, the circuit court shall enter
judgment in favor of the Attorney General with respect
to his nuisance claim. This shall include the entry of
any order that may be necessary to abate the nuisance
and to enjoin PowerPick's continuing operations.

In contrast, the circuit court did not consider or
address the Attorney General's MCPA claim. The cir-
cuit court shall consider this claim on remand.

Reversed and remanded for further proceedings con-
sistent with this opinion. We do not retain jurisdiction.
No costs under MCR 7.219, a public question having
been involved.

MARKEY, J., concurred.

HOEKSTRA, J. *(concurring in part and dissenting in
part).* I agree and join with the holdings of the majority in
part II(C)(2) that PowerPick violates MCL 432.27(1) by
reselling lottery tickets at a price greater than that fixed
by the Michigan Lottery commissioner and part II(C)(3)
that PowerPick violates MCL 750.372 because its random
drawings for Michigan scratch-off lottery tickets consti-

tute an illegal lottery and that its MegaPools constitute an illegal gift enterprise. I also agree and join with the holding of the majority in part III that PowerPick's affirmative defenses fail as a matter of law. In addition, I agree that a remand is appropriate for consideration of the Attorney General's claims under the Michigan Consumer Protection Act, MCL 445.901 *et seq.*

However, I respectfully disagree with the majority's conclusion in part II(C)(1) that PowerPick's business practice of randomly assigning its customers to pools constitutes a second bet because the customer is *"buy-[ing] the chance* of being assigned to one or more winning pools," *ante* at 30 (emphasis in original), and this chance is one of the reasons why its customers pay an amount that is 51 percent greater than the face value of the tickets purchased. On the basis of its interpretation of PowerPick's practice of assigning its customers to pools, the majority holds that PowerPick receives bets contrary to MCL 750.301, registers bets contrary to MCL 750.304, and possesses memoranda of bets contrary to MCL 750.306. In contrast, although not disputing that it charges its customers 51 percent more than what it spends to purchase lottery tickets, Power-Pick maintains that it is merely providing a service to its customers and that the amount greater than that used to purchase tickets represents its costs and profits. In my opinion, whether the amount charged in addition to the cost of the purchased lottery tickets is a reasonable amount to pay for PowerPick's business expenses and profits, or in part is a second bet that buys the customer a chance to be assigned to a winning pool, is a disputed question of fact that cannot be resolved on a motion for summary disposition. Consequently, on this specific issue, I would affirm the trial court's holding that factual issues remain.

I also respectfully disagree with the holdings of the majority in parts II(C)(4) and (5) that "PowerPick's business operations, taken as a whole, constitute a public nuisance," *ante* at 45, and that "PowerPick's office in Comstock Park and 'the furniture, fixtures, and contents' of that office constitute a nuisance as a matter of law," *ante* at 45. Because I believe that factual questions exist concerning whether PowerPick's business practice of assigning its customers into pools violates the provisions of the Michigan Penal Code at issue, any determination whether PowerPick's business operations and its office constitute a nuisance for such violations is premature. Moreover, whether Power-Pick's violation of MCL 432.27(1) constitutes a public nuisance and, if it does, whether the violation is subject to the sanctions provided for in MCL 600.3801 are questions of first impression. In *Attorney General, ex rel Optometry Bd of Examiners v Peterson*, 381 Mich 445, 465; 164 NW2d 43 (1969), the Supreme Court noted that, "[a]t common law, acts in violation of law constitute a public nuisance" and that the Attorney General may sue to enjoin such nuisances. Therefore, although no court has addressed the issue, it is arguable that PowerPick's violation of MCL 432.27(1) renders its business a public nuisance. However, the *Peterson* Court qualified its holding by noting that "[h]arm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare." *Id.* at 465. Numerous cases hold that the criminal gambling statutes, such as MCL 750.301, MCL 750.304, and 750.306, were enacted to preserve public health, safety, and welfare. See, e.g., *Parkes v Recorder's Court Judge*, 236 Mich 460, 465-466; 210 NW 492 (1926); *Oakland Co Prosecutor v 46th Dist Judge*, 76 Mich App 318, 326; 256 NW2d 776 (1977). But whether MCL 432.27(1) was enacted to preserve public health, safety,

and welfare is not a settled question. Because the Attorney General only argued below that a violation of MCL 432.27(1) provided an additional reason for concluding that PowerPick's operation was a public nuisance, the issue whether MCL 432.27(1) was enacted to preserve public health, safety, and welfare was not raised in the trial court, nor was it briefed on appeal. Under these circumstances, I would remand to the trial court for initial consideration of whether a violation of MCL 432.27(1) constitutes a public nuisance and, if so, whether, and to what extent, the violation is subject to the sanctions of MCL 600.3801.

Finally, I agree with the holding of the majority in part II(C)(5) that PowerPick's drawings for scratch-off lottery tickets are "gambling" and, therefore, Power-Pick can be sanctioned under MCL 600.3801. However, unlike the majority, I would also remand to the trial court for a determination of what, if any, assets are subject to the sanction provided by MCL 600.3801 for this particular violation.