# STATE OF MICHIGAN

# COURT OF APPEALS

CITY OF BRIGHTON,

        Plaintiff-Appellee,

v

LEON V BONNER and MARILYN E BONNER,

        Defendants-Appellants.

UNPUBLISHED
October 30, 2014

No. 314597
Livingston Circuit Court
LC No. 09-024900-CZ

LEON V BONNER and MARILYN E BONNER,

        Plaintiffs-Appellants,

v

CITY OF BRIGHTON,

        Defendant-Appellee.

No. 314854
Livingston Circuit Court
LC No. 09-024680-CZ

Before: CAVANAGH, P.J., and JANSEN and RONAYNE KRAUSE, JJ.

PER CURIAM.

In this consolidated appeal, Leon V. Bonner and Marilyn E. Bonner[1] appeal by right the trial court's order that, *inter alia*, ordered certain houses owned by the Bonners to be demolished.[2] We affirm.

---

[1] We will refer to the parties by name for convenience.

[2] The instant appeal is presently limited to Docket No. 314597 only. In Docket No. 314854, the Bonners also appealed the trial court's denial of attorney fees, but they withdrew that issue when it became moot pursuant to our Supreme Court's decision in *Bonner v City of Brighton* ("*Bonner III*"), 495 Mich 209; 848 NW2d 380 (2014).

-1-

The Bonners own several very old houses in the City of Brighton, of which two are at issue in the instant appeal, that have been the subject of litigation between the parties dating back at least 35 years. In 1973, Brighton turned off water to the houses on the basis of various building code violations. Although the Bonners contend that they always kept electrical service and heat to the properties and visited them weekly, the last time any of the properties were actually occupied was in approximately 1974. The Bonners commenced suit, and on March 13, 1978, the Livingston Circuit Court entered a judgment that, *inter alia*, ordered "that the City of Brighton shall, upon request of [the Bonners], resume water service to the five premises in question so that [the Bonners] may comply with all of the housing regulations of the City of Brighton." The same day, Brighton's city attorney filed in the Livingston County Register of Deeds an affidavit attesting that the properties were uninhabitable because of ordinance violations. The trial court's order also held that the Bonners may not occupy the properties until Brighton had inspected them and the Bonners had complied with "all of the requirements of the Ordinances and regulations of the City of Brighton," and if the Bonners did occupy them before such compliance, Brighton could summarily suspend water services again.

The Bonners appealed the issue to this Court. This Court held that Brighton had unjustifiably turned off water service to the properties because the properties' water service was unrelated to the properties' housing code violations, so Brighton was not permitted to turn off the water to enforce code compliance. *Bonner v City of Brighton* ("*Bonner I*"), 91 Mich App 547, 549, 550-552; 284 NW2d 793 (1979). However, this Court also found that "the premises in question were replete with various code improprieties including falling plaster, defective steps, water seepage and exposed electrical wires" which "existed prior to the water service interruption and there was no showing that the city's action in any way affected [the Bonners'] ability to repair the premises." *Id*. at 552. Notwithstanding the Bonners' "endeavor[s] to point out improprieties in the city's activities," this Court found no clear error in the trial court's ruling that the Bonners had sustained no damages because of the water service discontinuation. *Id*. At no time did this Court actually order Brighton to restore the Bonners' water service.

The Bonners testified that they asked Brighton to restore their water service once, "quite a long time ago," apparently in June of 1980, although their testimony was at times unclear. It is undisputed that Brighton never restored the Bonners' water service. However, insofar as we can determine from thoroughly searching the record available to us,[3] the Bonners never pursued any kind of contempt action, as they would have been entitled to do promptly upon Brighton's alleged noncompliance. See *In re Contempt of United Stationers Supply Co*, 239 Mich App 496, 503-505; 608 NW2d 105 (2000). Furthermore, and even more critically, the record is devoid of any evidence that the Bonners made any serious attempt to comply with their own obligations under the trial court's order to bring the houses into compliance with the applicable ordinances and codes until 2009. In January of 2009, Brighton sent the Bonners notice that the houses at

---

[3] We have not been provided with a complete record. In particular, the lower court record submitted to us begins with Volume 8. As the appealing party, the Bonners are responsible for providing us with a complete record on appeal. See *In re Estate of Eggleson*, 266 Mich App 105, 109 n 2; 698 NW2d 892 (2005).

issue were in violation of Brighton City Ordinance (BCO) § 18-47, which prohibits "unsafe structures," and constituted common law nuisances, and further that the houses had been determined to be "unreasonable to repair" pursuant to BCO § 18-59, so the Bonners were required to demolish them within 60 days pursuant to BCO § 18-61.

Pursuant to BCO § 18-61, the Bonners were entitled to appeal to the City Council, which they did. Among other actions, the Bonners undertook to submit building permit applications to Brighton, which Brighton denied. In significant part, Brighton contended that the structures were unsafe and would cost more than they were worth to repair, so pursuant to BCO § 18-59, their demolition was required. Brighton officials gave a presentation to the Brighton city council, and the Bonners were also given the opportunity—which they took—to give their own presentation. On July 16, 2009, the Brighton city council adopted Resolution 09-16, which concluded in effect that the Bonners had failed to convince the council that the houses were reasonable to repair, so the structures must be demolished. Brighton gave the Bonners 60 days in which to demolish the houses; instead, the Bonners filed suit against Brighton, alleging that Brighton was violating their rights to procedural and substantive due process and equal protection, engaging in inverse condemnation or a regulatory taking, in contempt of court, slandering the Bonners' title, and in violation of Michigan housing laws. Thereafter, Brighton issued a show-cause order to the Bonners which resulted, *inter alia*, in the Bonners participating in a hearing at which they again were given an opportunity to demonstrate why the houses should not be demolished. The Brighton city council rejected the Bonners' position and subsequently filed its own complaint, seeking injunctive relief to enforce BCO § 18-59 and compel demolition of the houses. The two actions were subsequently consolidated.

Throughout the ensuing litigation, the Bonners repeatedly sought court authorization to engage in repairs or upgrades to the houses, which the trial court mostly denied. The Bonners make much of these requests, but despite scouring the record both before and after oral argument, we have been unable to find any suggestion whatsoever that the Bonners made any such requests *before* 2009; i.e., for approximately 30 years after being ordered to bring their uninhabitable houses into code compliance. The record also discloses no reason why the Bonners could not have engaged in equally vigorous efforts earlier. The trial court found that "the Bonners' claim for a violation of Due Process based on the City's refusal to turn the water back on is time-barred under MCL 600.5805(10)." However, the trial court also found that the Bonners were entitled to notice and an opportunity to be heard before their nonconforming use status could be revoked and that BCO § 18-59 was facially violative of substantive due process.

Brighton appealed the latter holding to this Court. On appeal, this Court agreed with and affirmed the trial court. *Bonner v City of Brighton* ("*Bonner II*"), 298 Mich App 693, 731; 828 NW2d 408 (2012). On further appeal, our Supreme Court reversed, although it noted that the issue presented was purely a facial challenge to BCO § 18-59, not an as-applied challenge. *Bonner v City of Brighton* ("*Bonner III*"), 495 Mich 209, 213, 223, 241; 848 NW2d 380 (2014). Our Supreme Court held that BCO § 18-59 did not facially deny the Bonners substantive or procedural due process, and it remanded for further proceedings. *Id*. at 241. This Court's grant of leave to appeal in *Bonner II* was limited to the constitutionality of BCO § 18-59; neither this Court nor our Supreme Court addressed the other holdings in the trial court's order.

While the appeals in *Bonner II* and *Bonner III* were pending, proceedings in the trial court continued on the parties' other theories. Brighton sought the demolition of the properties on the basis of common law nuisance and the Michigan Building Code. The Bonners continued to seek permits to repair the properties and asserted that Brighton's refusal to permit them to do so essentially meant Brighton was maintaining the nuisance rather than the Bonners. The trial court had by that time held that it "shocks the Court's conscience" for an ordinance to permit demolition of a building without providing property owners "a reasonable opportunity" to bring the property "up to code" and "repaired by the owner to the City's standards." However, there remained an outstanding question of whether the applicable code was the "residential code or commercial code," because the locations of the houses were by then zoned for commercial use. Pursuant to BCO § 98-106(4), "[i]f a nonconforming use of any building or premises is discontinued or its normal operation stopped for a period of one year, the use of the same shall thereafter conform to the regulations of the district in which it is located." Consequently, a significant issue became whether the Bonners had lost their prior nonconforming residential use, the resolution of which would dictate whether the houses would need to be brought up to residential or commercial codes.

Both Bonners testified that they never had any intention of discontinuing their use of the houses for residential purposes, and to that end they kept furniture, electricity, a stove, and a stocked refrigerator in them, and Leon visited them at least weekly and performed some work on them. However, despite the Bonners' reluctance to concede that the houses had not been lived in for in excess of 30 years, they did admit that they had not themselves lived in them since the early 1970's. Furthermore, they could not identify anything they had done since 1980 to comply with the 1978 circuit court judgment. As noted, the Bonners asked for their water service to be restored at most one time and made no effort to follow up on that request. Significant evidence was introduced tending to show that the houses were uninhabitable well beyond merely lacking water service: in addition to the serious problems observed by this Court in 1979, pipes were broken, sanitary facilities were nonexistent, the roofs were open to the elements, and various other aspects of the buildings were dangerous or falling apart.[4] Indeed, the evidence showed that the plumbing was so egregiously defective that it would not be *possible* to restore water service. The evidence showed that not only had the houses not been inhabited in a very long time, but that in their current conditions they were uninhabitable for reasons far beyond mere noncompliance with any particular codes or ordinances.

The trial court issued an opinion and order that, in relevant part, dismissed the Bonners' takings and inverse condemnation claims on the ground that the Bonners had admitted that the houses were nuisances, found genuine questions of material fact whether the Bonners' claims that Brighton had caused them water damage by constructing a parking lot, dismissed the Bonners' procedural due process claims for failure to identify any hearing or procedure to which they were entitled but did not receive, and dismissed the Bonners' substantive due process claims for failure to identify any "truly irrational" act by the city. The trial court also found that Brighton had afforded the Bonners sufficient due process regarding the determination that the

---

[4] At one point, "eight inches of rodent feces" was mentioned, albeit in unclear context.

Bonners' houses had lost their prior nonconforming use; it also found that in fact the Bonners' houses had lost their nonconforming use. The trial court ordered that the Bonners would nevertheless have an opportunity to repair; consequently, it required Brighton to submit a "list of concerns on the subject properties" to the Bonners, and it required the Bonners to "apply for all the necessary permits to repair the subject properties" after receiving that list.

Brighton filed with the court a 45-page list of concerns. The Bonners challenged that list, asserting that the houses were not going to be put to commercial use or be open to the public, the Bonners had "never asked for occupancy of the homes," and Brighton should provide only a "list of concerns from the City that represent a danger or a nuisance to the health, safety and welfare of the general public." The Bonners argued that Brighton's concerns were about occupancy rather than dangerous conditions to the public, and having a functional staircase, a toilet, or "not having a sink when the City turns off your water" had nothing to do with dangers to the public. Brighton argued that its list of concerns was necessarily somewhat lengthy because of the wide variety of commercial uses to which the houses could be put and the concern that its list might be construed later as having been intended to be exhaustive.

The trial court found that Brighton had complied with its order, and it reiterated that it had found the buildings to have lost their residential use status, so "if they wish to keep these buildings standing" the Bonners needed "to get with a licensed architect or engineer and get the appropriate plans ready to go – get 'em over to the City so that appropriate plans and permits can be provided so that the homes at issue can be built or rebuilt under the appropriate commercial building standard." The trial court admonished Brighton that it "expect[ed] the City to comply with the commercial building code as they would respond to any other citizen bringing an application for permits to the city."

The Bonners retained a home restoration contractor and filed permit applications, but argued that the houses would not be occupied and were not dangerous, and the work on the houses should be pursuant to Michigan Rehabilitation Code for existing buildings instead of the Michigan Building Code. The Bonners' application included no drawings. Brighton argued to the trial court that the Rehabilitation Code was inapplicable given the "scandalously large amount of work that needs to be done in this case," that only residential homeowners working on their own homes were exempted from the need to file plans, and the Bonners' applications were incomplete because they only generally asserted that work would be done on certain items, whereas "under the Michigan Building Code what's required is that the applicant has to identify and describe the work to be covered by the permit" and "actually describe the work that's gonna take place." The trial court ultimately agreed with Brighton and held that the Bonners had not complied with its order to submit the requisite permit applications. Consequently, the trial court held that the Bonners' opportunity to repair the houses had been lost, and the Bonners were required to abate the nuisance that they constituted by demolishing the houses. The instant appeals followed.

Factual findings made by a trial court are reviewed for clear error, reversible only if totally unsupported or if this Court is definitely and firmly convinced that they are mistaken, but with great deference given to the trial court's superior ability to evaluate the credibility of the witnesses and parties who appeared before it. *Augustine v Allstate Ins Co*, 292 Mich App 408, 424-425; 807 NW2d 77 (2011). "[W]hether equitable relief is proper under those facts is a

question of law that an appellate court reviews de novo." *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008). Interpretation of statutes functions identically to interpretation of municipal ordinances; either is a question of law that is reviewed de novo. *Bonner III*, 495 Mich at 221-222. A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Questions of constitutional law are legal questions that are reviewed de novo. *Madugula v Taub*, 496 Mich 685, 695; ___ NW2d ___ (2014). Likewise reviewed de novo is the proper application of constitutional standards to facts. *In re Contempt of Dorsey*, ___ Mich App ___, ___; ___ NW2d ___ (2014) (Docket No. 309269, slip op. at p 7).

The Bonners first argue that the trial court erred in finding that they had lost their prior nonconforming residential use through abandonment. We find that one of the trial court's factual findings was clearly erroneous, but the trial court nevertheless reached the inescapably correct conclusion.

There is no dispute that the Bonners had a prior nonconforming use of the property as residential, in conflict with the present commercial zoning of the area. To "abandon" a particular use of a property, the owner must voluntarily relinquish that use, meaning the owner must intend to do so and must commit an act or omission "which clearly manifests [the] voluntary decision to abandon." *Rudnik v Mayers*, 387 Mich 379, 384; 196 NW2d 770 (1972). Merely ceasing to engage in a particular use is insufficient to abandon that use, and lapse of time alone is a factor to be considered but not per se determinative of the intent to abandon. *Id*. at 385. The municipality must carry the burden of proving not only nonuser, but "nonuser combined with an intention to abandon the right to the nonconforming use." *Dusdal v City of Warren*, 387 Mich 354, 360; 196 NW2d 778 (1972). Consequently, the Bonners are correct in asserting that they cannot be deemed to have abandoned the residential use of their property merely because they have not actually resided in the houses for some period of time. However, Brighton equally correctly points out that the Bonners' nonuse of their houses for residential purposes remains *relevant*, even if it is not dispositive, and context is also relevant.

The only mistake we note is that Brighton and the trial court concluded that the Bonners used their houses for "storage" because they kept furniture in the houses. "Storage" could constitute a commercial use of the premises. However, the evidence does not suggest that any of the items the Bonners kept in the houses, or the way in which they kept those items there, differed significantly from the way in which any residential homeowner would keep furniture and appliances in a lived-in house. Characterizing doing so as "storage," without some evidence that, for example, the appliances or furniture were kept in such a way that they could not readily be used, is essentially a bootstrapping problem: the lack of an active intent to make use of the furniture and appliances would make their keeping "storage," but keeping them per se does not necessarily prove anything one way or the other.

Nevertheless, the condition of the houses is highly relevant and strongly manifests an intent to abandon residential use of the properties. As discussed above, the houses were literally falling apart and the evidence overwhelmingly showed that they were uninhabitable. The Bonners' only rebuttal argument was that Brighton had turned off their water and refused to turn it back on. This argument is simply preposterous, and the Bonners present absolutely no support

-6-

for the extraordinary contention that a lack of running water somehow precludes a homeowner from engaging in repairs or maintenance. Running water is not required to maintain roofs, maintain foundations, perform electrical work, exclude vermin, or otherwise arrest or reverse any of the other myriad ways in which the houses at issue were shown to have been disintegrating since the early 1970's. As we noted in 1979, the houses were *already* in violation of ordinances *before* Brighton cut off their water. Although Brighton denied building permits after it declared the houses to be nuisances, there is no evidence that the Bonners made any serious effort between 1979 and 2009 to restore the houses to habitable conditions.

If the *only* reason why the houses were uninhabitable was the lack of water service, the Bonners could plausibly argue that Brighton did not carry its burden of showing an intention to abandon residential use. However, the evidence unambiguously shows that they were uninhabitable for many other reasons, none of which the Bonners appear to have shown any interest in correcting for in excess of thirty years. The trial court did not clearly err in finding that the houses had been uninhabitable for decades, and the trial court properly concluded that the Bonners' apparent lack of interest in preventing them from decaying manifested an intent to abandon the residential use thereof.

The Bonners next argue that they were deprived of "due process" because they received inadequate notice that Brighton intended to extinguish their houses' nonconforming use status. The Bonners' brief is difficult to comprehend, but because the entirety of their argument refers to notice and the opportunity to be heard, the gravamen of their claim pertains to procedural due process. This Court has explained:

> Procedural due process serves as a limitation on governmental action and requires a government to institute safeguards in proceedings that might result in a deprivation of life, liberty, or property. Procedural due process generally requires notice [and] an opportunity to be heard, before an impartial trier of fact, and a written, although relatively informal, statement of findings. In other words, procedural due process requires that a party be provided notice of the nature of the proceedings and an opportunity to be heard by an impartial decision maker at a meaningful time and in a meaningful manner. [*Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 213-214; 761 NW2d 293 (2008) (internal citations omitted).]

This issue is unambiguously moot because we cannot craft an order that would have any practical effect on the facts or any party's rights or otherwise grant any meaningful relief. See *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998). At this juncture, the Bonners have received full judicial review of whether they had abandoned the residential use of the houses. Presuming Brighton had not provided the Bonners with adequate notice or a meaningful opportunity to contest its decision, the Bonners have now had that decision fully reviewed by the judiciary. There is no practical relief we could order regarding this issue.

The Bonners next argue that the trial court erred by finding that their houses constituted a nuisance on the basis of a statement made by their attorney. We agree, but we find the error harmless and the trial court's conclusion amply supported and inevitably required by the record.

The trial court indeed based its finding that the houses constituted a nuisance on a statement made by the Bonners' counsel. We fully appreciate the trial court's frustration with the Bonners' counsel; however, we have carefully analyzed the transcript of the hearing at issue, and we conclude that the Bonners' counsel did not, in fact, make a binding admission. "[A] statement made by a party or his counsel, in the course of trial, is considered a binding judicial admission if it is a distinct, formal, solemn admission made for the express purpose of, *inter alia*, dispensing with the formal proof of some fact at trial." *Ortega v Lenderink*, 382 Mich 218, 222-223; 169 NW2d 470 (1969). See also *Zantop Int'l Airlines*, *Inc v Eastern Airlines*, 200 Mich App 344, 364; 503 NW2d 915 (1993) (noting that arguments of counsel are neither evidence nor stipulations of fact). Thus, the Bonners are "entitled to the benefit of testimony in support of a verdict in [their] favor despite [counsel's] expression of an opinion inconsistent therewith." *Ortega*, *supra*, 382 Mich 223.

After hearing oral arguement in this matter, it is readily apparent that, in contrast to the usual situation, our ability to scrutinize the transcript gives us an advantage over the trial court being subjected to counsel's argument in real time. We are therefore highly sympathetic to the trial court's conclusion. Nevertheless, although the Bonners' counsel's argument to the trial court was not a model of clarity, it is apparent that he was attempting to argue what he accurately characterized as a repeated theme running throughout the litigation: that the Bonners claim to have wanted to fix whatever Brighton believed was wrong with the houses but were being prevented from doing so by Brighton itself. Whether or not the argument has merit, it is clear that the Bonners' counsel was making it. The Bonners essentially argued that it was unfair for Brighton to assert that there was a nuisance without allowing the Bonners to abate it, which is not, strictly speaking, the same as conceding that the houses actually are nuisances. Furthermore, the trial court placed the Bonners themselves on the stand and took sworn testimony from them in which they both asserted that they did *not* believe their houses to be nuisances. Parsing the Bonners' counsel's argument in real time was undoubtedly challenging, but nevertheless, the trial court clearly erred by deeming it to be a concession.

Despite that error, the record nonetheless demands the trial court's conclusion. Actions to abate nuisances are generally equitable. *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 270; 761 NW2d 761 (2008). There are two kinds of nuisances under Michigan law: nuisances at law and nuisances in fact. *Bluemer v Saginaw Central Oil & Gas Service*, *Inc*, 356 Mich 399, 411; 97 NW2d 90 (1959). Nuisances at law, also called nuisances per se, are uncommon and are found only where something is always a nuisance under any circumstances or context. *Id*. Nuisances in fact depend on the circumstances and the danger the act or thing poses within that context. *Id*. Whether a condition is a nuisance in fact is a question of fact. *Kircher*, 281 Mich App at 269. It appears that the houses here were asserted to be nuisances in fact rather than nuisances at law; however, the houses here could be either.

First, pursuant to MCL 125.3407,[5] the use of a structure or building in violation of a zoning ordinance is a nuisance per se and may be ordered by a court to be abated. See *Lima Twp v Bateson*, 302 Mich App 483, 493; 838 NW2d 898 (2013). The record abundantly supports the conclusion that the houses are grossly nonconforming and have been since the 1970's, no matter whether they are held to a commercial standard or a residential standard.

Second, a nuisance in fact is a situation that, in its place or locality and time, tends naturally to create a danger to person or property. *Orion Charter Twp v Burnac Corp*, 171 Mich App 450, 459-460; 431 NW2d 225 (1988). Buildings may not be considered hazards or ordered razed *solely* because they are old and dilapidated. See *City of Saginaw v Budd*, 381 Mich 173, 177-178; 160 NW2d 906 (1968). However, notwithstanding the Bonners' offers of proof and offers to present expert testimony, the record establishes that the houses were far more than merely old and dilapidated, but were in fact falling apart to the point of endangering the health, safety, peace, comfort, or convenience of the public. See *Bronson v Oscoda Twp (On Second Remand)*, 188 Mich App 679, 684-685; 470 NW2d 688 (1991). Strictly speaking, the point is a debated one. Nevertheless, had the trial court reached its conclusion on the basis of the actual evidence in this record, we would find clear error had the trial court reached any other result. We will not waste judicial resources remanding the matter when there is only one possible correct outcome.

The Bonners next argue that the trial court's order that the houses should be demolished was impermissibly excessive. We disagree.

Our Supreme Court has explained that, in the context of a fire hazard statute, "[t]he remedy prescribed should be no greater than is necessary to achieve the desired result," so "something less than destruction of the entire building should be ordered where such will eliminate the danger or hazard." *Childs v Anderson*, 344 Mich 90, 95-96; 73 NW 280 (1955). The Bonners rely on that holding for the proposition that because the trial court never specifically identified what hazard was present, and the Bonners were prepared to offer expert testimony to the effect that there was no hazard at all, demolition was necessarily an abuse of discretion.

However, the Bonners ignore the remainder of *Childs*, in which our Supreme Court held that demolition *was* permissible if the property owner failed to repair the buildings at issue to abate the excessive fire risk. *Childs*, 344 Mich at 96. Again, we agree that buildings may not be considered hazards or ordered razed *solely* because they are old and dilapidated. See *Budd*, 381 Mich at 177-178. However, the houses here were more than merely old and dilapidated, and there is no general constitutional right to repair rather than raze a structure found to be unsafe. *Bonner III*, 495 Mich at 231. Furthermore, as noted previously, pursuant to MCL 125.3407, the use of a structure or building in violation of a zoning ordinance is a nuisance per se and may be ordered by a court to be abated. See *Bateson*, 302 Mich App at 493.

---

[5] MCL 125.3407 refers to zoning ordinances "enacted under this act." According to BCO § 98-1, its zoning ordinances were adopted pursuant to the predecessor to the current Zoning Enabling Act.

We note that the trial court actually did attempt to order a minimal sanction of bringing the houses up to the applicable code requirements. Failure by the owner of a nuisance structure to make minimal necessary repairs—bringing the buildings up to the applicable code, in this case—forfeits any entitlement to such lesser sanction. The trial court attempted to impose upon the Bonners an order that they make necessary repairs, and when the Bonners failed to do so, the trial court properly ordered demolition.

The Bonners also argue that the trial court erred by ordering that the houses should be remodeled to commercial standards, because the Bonners had no intention of using them for commercial purposes and the trial court had already spent years denying multiple requests by the Bonners to abate any hazards. We disagree. As we have already explained that we are unimpressed with the Bonners' after-the-fact requests to perform the maintenance that the houses had desperately needed for decades despite no apparent impediment to having at least attempted to do so. Whether the Bonners intended to put the houses to commercial use is irrelevant. It is essentially axiomatic that if any such repairs are permitted, they must be according to the applicable code. See *Florio v Chernick*, 45 Mich App 237, 240; 206 NW2d 538 (1973).

The Bonners next argue that Brighton is continuing to unlawfully deprive their houses of water in violation of this Courts' 1979 opinion and order. We disagree. The Bonners also note that Brighton sent them a water bill after almost three decades of no water service. We find that fact irrelevant.

Initially, the Bonners clearly misunderstand the nature of the relevant orders: at no time was Brighton explicitly ordered to turn the Bonners' water back on. As discussed in *Bonner I*, the trial court ordered that Brighton must turn water on *upon request* but that Brighton may turn the water back off should the Bonners attempt to use the properties without first coming into compliance with Brighton's ordinances and regulations. See *Bonner I*, 91 Mich App at 550. This Court held only that Brighton may not withhold water service to enforce code compliance. *Id*. at 550-552. This Court left untouched the Bonners' obligation to request service restoration, and it also left untouched the lower court's order to the effect that the purpose of water restoration was "so that the Plaintiff may comply with all of the housing regulations of the City of Brighton." *Id*. at 550.

The Bonners assert that the trial court improperly found their request for water service restoration in the instant litigation to be barred by the doctrine of laches. Even presuming the Bonners' request for water service restoration is in the nature of a mandamus request, as they argue, there is no restriction against the application of the doctrine of laches to such a request. See *People ex rel Owen v Lincoln Twp Bd*, 41 Mich 415, 415; 49 NW 925 (1879). Further presuming the Bonners actually did request the restoration of their water service in 1980,[6] Brighton's failure to do so would, as noted, have entitled the Bonners to bring a contempt action promptly upon Brighton's apparent noncompliance. See *In re Contempt of United Stationers*

---

[6] According to Brighton, its personnel were unable to locate any record of the Bonners making such a request in 1980, but Brighton was unable to categorically deny any possibility that the Bonners had actually done so.

-10-

*Supply Co*, 239 Mich App at 503-505. For some thirty years, the Bonners did not do so, and presuming the pipes in the Bonners' houses could have withstood water service being restored at the time, the evidence overwhelmingly shows that water service is now physically impossible to restore safely.

The situation at bar is a perfect example of a lack of diligence on the part of the Bonners coupled with a change in circumstance that makes relief inequitable for, at a minimum, the reason that doing so would be unsafe. See *Attorney General v PowerPick Club*, 287 Mich App 13, 51; 783 NW2d 515 (2010). As discussed, *Bonner I* held that the Bonners suffered no damages as a result of the termination of their water service, and water service makes no difference to their ability to otherwise restore the houses to habitability. Furthermore, this is not a situation in which Brighton made half-hearted and bad-faith overtures toward compliance in order to induce the Bonners to delay bringing the matter to the attention of the courts. See *Stabile v General Enterprises*, 70 Mich App 711, 717-718; 246 NW2d 375 (1976). The Bonners, for whatever reason, simply failed to assert their ostensible rights, and circumstances now preclude relief.

The Bonners make much of the fact that they were charged for some manner of water service despite receiving and using no water. The evidence showed that Brighton charged *all* properties with water service connections either a "minimum use charge" or a "readiness to serve charge," irrespective of whether the properties actually used any water. In other words, the Bonners were not charged for actual service, but for the infrastructure to be available to the property. The Bonners fail to articulate how it is unfair for all properties attached to a public infrastructure to bear some shared responsibility for ensuring that the infrastructure remains operable and available. Furthermore, the Bonners' arguments presume that such infrastructure is in fact available to the houses; otherwise, their water service could not even theoretically be turned back on.

The Bonners argue that the trial court should not have dismissed their claims against Brighton. We disagree. Initially, we note that the Bonners state that their "due process" claims are premised on this Court's opinion in *Bonner II* finding BCO § 18-59 unconstitutional, which our Supreme Court has since reversed in *Bonner III*. The Bonners do not advance any other due process theory not already addressed elsewhere, so they are meritless and we need not discuss them further. Some of the Bonners' claims were dismissed by agreement in the trial court and also need not be discussed.

Regarding the Bonners' takings and inverse condemnation claim, the Bonners point out, accurately, that they sued Brighton for allegedly unconstitutionally denying them permits to repair the houses before Brighton commenced suit against the Bonners. However, as we have discussed, we have found no evidence in the record, and the Bonners assert none, even suggesting that the Bonners made any attempts to obtain permits or perform repairs until *after* Brighton issued its notices that the houses must be demolished. In other words, those permit requests occurred *after* the houses had fallen into a state of disrepair that the Bonners had seemingly not previously been interested in rectifying *and* Brighton had already commenced proceedings to have them demolished. Furthermore, Brighton was acting to abate what it believed to be a nuisance *in a particular manner*, namely by demolition. The Bonners' argument

amounts to a claim of right to abate a nuisance in whatever way they wish and to whatever standards they wish. As discussed, our Supreme Court found that no such right exists.

The Bonners' slander of title claim is based on the 1978 affidavit filed by Brighton contemporaneously with the 1978 circuit court decision. Unfortunately, the Bonners' argument is simply nonsensical: the Bonners state, "repairs could not be made because the City had unlawfully turned off the Bonners' water." The Bonners do not in any way support the assertion that a lack of running water could somehow impede repairs and maintenance to a house, and as we have already stated, we cannot imagine how it could. The Bonners' argument that Brighton denied all permits for repairs ignores, again, the fact that no evidence suggests any such permits were requested until 2009. The Bonners point out that the affidavit states that no occupancy of the houses could be permitted until the houses were repaired, which appears to be a strictly and literally accurate summary of the facts. Slander of title requires, at common law or by statute, a showing of falsity, malice, and special damages. *Federal Nat'l Mortgage Ass'n v Lagoons Forest Condo Ass'n*, 305 Mich App 258, 223; 852 NW2d 217 (2014). The Bonners have shown none of these three elements.

The Bonners finally argue that Brighton's nonconforming use ordinance, BCO § 98-106(4), is unconstitutional because it automatically eliminates a nonconforming use simply due to a year of nonuse, with no allowance for notice or a hearing and does not consider the property owner's intent. We disagree. The word "discontinued" in a nonconforming use ordinance is construed liberally to mean "abandoned." *Rudnik*, 387 Mich at 384. Therefore, the loss of a nonconforming use requires proof of intent irrespective of the literal language of an ordinance. *Livonia Hotel LLC v City of Livonia*, 259 Mich App 116, 127-128; 673 NW2d 763 (2003). The Bonners accurately read the plain language of the nonconforming use ordinance as facially conflicting with Michigan law. However, the operation of the ordinance will comply with the law in any event. There would be no basis for declaring it unconstitutional because in practical reality it is not. Indeed, the evidence showed that the officials charged with enforcing the ordinance all believed that intent was critical and acted accordingly.

Affirmed. Plaintiff, being the prevailing party, may tax costs. MCR 7.219(A).

/s/ Mark J. Cavanagh
/s/ Kathleen Jansen
/s/ Amy Ronayne Krause

-12-